IN the MATTER OF the MENTAL CONDITION OF C.J.:
C.J., Appellant,†

v.

STATE of Wisconsin, Respondent.

Court of Appeals

*No. 84–664. Submitted on briefs July 2, 1984.—
Decided July 25, 1984.*
(Also reported in 354 N.W.2d 219.)

For the appellant, the cause was submitted on the briefs of *Mary E. Waitrovich,* assistant state public defender.

† Petition to review denied.

For the respondent, the cause was submitted on the brief of *Nancy E. Maloney,* assistant district attorney, of Oshkosh.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.    This is an appeal from an involuntary commitment order for C.J. entered by the Winnebago county circuit court after a jury trial. The trial court gave the standard jury instruction on involuntary commitment and submitted a special verdict to the jury consisting of three questions: (1) whether C.J. is mentally ill; (2) whether he is dangerous to himself or others, and (3) whether he is a proper subject for treatment. C.J. contends that the standard jury instruction defining when a person is a proper subject for treatment misstates the law. The instruction allows juries to consider a person to be treatable if they can find that the commitment would help to *control* the mental disorder. C.J. claims that only when involuntary commitment will help cure the disorder, not merely control it, can the person be considered a proper subject for treatment. We disagree and affirm.

The facts are largely undisputed. C.J. is a man in his mid-forties who has been institutionalized for mental illness almost continuously since his teens. He has been a patient at the Winnebago Mental Health Institute since January 1983. In December 1983, C.J. petitioned for reexamination in accordance with sec. 51.20(16)(a), Stats.,[1] and requested a jury trial as provided in sec.

---

[1] Section 51.20(16)(a), Stats., reads:

Except in the case of alcoholic commitments under s. 51.45(13), any patient who is involuntarily committed for treatment under this chapter, may on the patient's own verified petition, except in the case of a minor who is under 14 years of age, or on the verified petition of the patient's guardian, relative, friend, or any person providing treatment under the order of commitment, request a reexamination or request the court to modify or cancel an order of commitment.

.

51.20(11)(a).[2]  A jury trial was held in January 1984; only one witness, Dr. Wilma Yapa, a psychiatrist, testified. She stated that C.J. suffers from a major mental illness described as schizophrenia chronic paranoid type. According to Dr. Yapa, the primary symptom of C.J.'s illness is recurrent delusions which impair his judgment and behavior. Dr. Yapa described C.J.'s treament program as a combination of medication, therapy and a structured environment aimed at suppressing C.J.'s aggressive behavior and the acting out of his delusions. Dr. Yapa conceded that C.J.'s mental disorder was likely to continue and that the prognosis was poor for restoring him to a pre-institutionalization level of functioning. Nonetheless, she claimed that the medication and institutional environment were necessary to improve C.J.'s aggressive behavior and enable him to deal with his delusions, even though they were unlikely to cure his disorder. Dr. Yapa concluded that C.J. was a proper subject for treatment.

In determining the issues for review, we first note that the three-question special verdict submitted to the jury corresponds to the elements required by statute for involuntary commitment. Sec. 51.20(1), Stats. These elements are embodied in a standard jury instruction—Wis J I—Civil 7050. The part of the instruction that focuses

---

[2] Section 51.20(11)(a), Stats., provides:

If before involuntary commitment a jury is demanded by the individual against whom a petition has been filed under sub. (1) or by the individual's counsel if the individual does not object, the court shall direct that a jury of 6 people be drawn to determine if the allegations specified in sub. (1)(a) are true. A jury trial is deemed waived unless demanded at least 48 hours in advance of the time set for final hearing, if notice of that time has been previously provided to the subject individual or his or her counsel. If a jury trial demand is filed within 5 days of detention, the final hearing shall be held within 14 days of detention. If a jury trial demand is filed later than 5 days after detention, the final hearing shall be held within 14 days of the date of demand.

on whether a person is a proper subject for treatment states that a person is a proper subject for treatment if the administration of treatment techniques "may control, improve, or cure the substantial disordering of the person's thought, mood, perception, orientation, or memory."

In challenging the jury instruction pertaining to whether a person is a proper subject for treatment, C.J. points out that sec. 51.01(17), Stats., defines treatment as various "techniques designed to bring about rehabilitation . . . ." He asserts that "control" is an element of the concept known as habilitation and is not a component of rehabilitation. C.J. maintains that the use of the word "control" in the jury instruction allowed the jury to consider an improper factor in determining whether C.J. was a proper subject for treatment.

C.J.'s argument that control is an element only of habilitation is based on his interpretation of an earlier court of appeals case, *In re Athans*, 107 Wis. 2d 331, 320 N.W.2d 30 (Ct. App. 1982).[3] The court in *Athans* used

[3] In her brief, the respondent assistant district attorney argues that *Athans* is not authority because court of appeals decisions are only binding on courts within each appellate district, sec. 752.02, Stats., notwithstanding. She claims that art. VII, § 5, (3) of our state constitution mandates this conclusion. She concludes that because *Athans* is a District I case, neither the Winnebago circuit court nor this court is bound by *Athans*. The argument confuses territorial jurisdiction with the concepts of precedent and authority. Section 752.41(2), Stats., declares that "[o]fficially published opinions of the court of appeals shall have statewide precedential effect." The Wisconsin supreme court has further emphasized the unitary nature of the court of appeals. *In re Court of Appeals of Wisconsin*, 82 Wis. 2d 369, 370, 263 N.W.2d 149, 149 (1978).

The published decision of any one of the panels has binding effect on all panels of the Court. The judges in each district are designated as a panel of the Court rather than as a separate court. . . .

The constitutional and statutory provisions clearly set forth the mandate that the Court of Appeals function as a single court under a chief judge and not function as four separate courts.

a department of health, education and welfare (HEW) definition of habilitative services to distinguish habilitation from rehabilitation.[4] Services that "assist an impaired person's ability to live in the community" were considered habilitation by the HEW. In comparison, the HEW definition of rehabilitation included techniques that "ameliorate impairments and facilitate an individual's capability to function." *Athans* at 336, 320 N.W.2d at 32. The court in *Athans* ruled that rehabilitation did not include habilitation and that an individual must be capable of rehabilitation to be a proper subject for treatment and therefore committable. *Id.* at 336–37, 320 N.W.2d at 32–33. C.J. claims that a treatment program of medication and a structured environment designed to help control his disorder amounts to nothing more than habilitation. He believes the program will not ameliorate his impairment or facilitate his capability to function. He concludes that the *Athans* case must be construed to view control as a component of habilitation not rehabilitation.

We conclude that C.J. defines habilitation too broadly and rehabilitation too narrowly. Services which "assist an impaired person's ability to live in the community" suggest that habilitation is more closely related to daily living needs and skills than to treatment of a particular

---

*Id.* at 371, 263 N.W.2d at 149–50. The supreme court reiterated this earlier determination in *In the Interest of J.S.R.*, 111 Wis. 2d 261, 262, 330 N.W.2d 217, 218 (1983). The court of appeals has also reached the subject. *See Dairyland Power Cooperative v. Nammacher*, 110 Wis. 2d 377, 381, 328 N.W.2d 903, 905 n. 1 (Ct. App. 1982). It would seem that after six years of a two-tier appellate system, the question of whether a published court of appeals decision is to be accorded statewide precedent should be no question at all.

[4] United States Department of Health, Education and Welfare, Health Resources Administration, *Health Planning Taxonomy* 4 (1979).

disorder. A practical definition of habilitation would include eating, dressing, hygiene, minimum social skills and such other things that facilitate personal maintenance and functioning.[5] Habilitation is a concept frequently associated with the long-term care of the developmentally disabled.[6] It is possible that controlling a person's activities by restricting his or her freedom and putting him or her on a carefully defined regimen would be part of a habilitation program.

In comparison, treatment going beyond custodial care to affect the disease and symptoms would be more accurately characterized as rehabilitation. Rehabilitation has a broader meaning than returning an individual to a previous level of function.[7] There are many situations where the prior level of functioning is unattainable because of the nature of the disorder. Rehabilitation cannot be considered the equivalent of cure. An individual with an incurable physical or mental illness or disability may still be considered capable of rehabilitation and able to benefit from treatment in the sense that symptoms can be controlled and the ability to manage the illness ameliorated. The term "ameliorate," also contained in the HEW definition of rehabilitation, does not mean to terminate a disease—it means to make better or more tolerable. Webster's New Collegiate Dictionary 36

[5] The examples specified in the HEW definition, i.e., sheltered employment and social and recreational programs for former psychiatric patients, reinforce this concept of habilitation. *See supra* note 4.

[6] The term "habilitation" is used in this context in sec. 51.437 (1), Stats.

[7] Harper Dictionary of Contemporary Usage 521 (1975) explains that the meaning of rehabilitation has been extended from the basic meaning of restoration to mean treatment of a disabled person to achieve mental and physical health so that the person may lead a useful life. C.J.'s stunted definitions of habilitation and rehabilitation are, perhaps, derived from his concept of the word "control."

(1977). We are satisfied that the use of the terms "control" and "improve" in the jury instruction are common sense synonyms for the term "amelioration."

C.J.'s analysis does not appreciate that there are at least two types of control and that depending on how the word is applied, control can be a component of either habilitation or rehabilitation or both. Controlling a person by restricting his or her freedom and putting the person on a carefully defined regimen may well be part of a habilitation program. Comparatively, treatment techniques that aim to control a disorder and its symptoms are clearly elements of rehabilitation. Both can be defined as "control," but we are convinced that it is the latter type of control, focusing on the disorder rather than merely on the activities of an individual, that is intended by the standard jury instruction used in C.J.'s trial.

Having clarified the concepts of habilitation and rehabilitation as they relate to control, *Athans* becomes readily distinguishable. In *Athans,* there were actually two cases, one involving a chronic paranoid schizophrenic and one involving a developmentally disabled person. The experts in *Athans* testified that neither of the persons named in the petitions was the proper subject for treatment. *Athans* at 333–34, 320 N.W.2d at 31–32. Furthermore, there was testimony in the case of the schizophrenic that her delusional scheme would not change no matter what treatment was tried and that hospitalization might actually be harmful. There can be little question that the expert testimony in *Athans* led to the trial court's finding that the two individuals, Athans and Haskins, were not proper subjects for treatment because these disorders could not be helped in any way.

By contrast, the psychiatrist testifying at C.J.'s trial concluded that C.J. was a proper subject for treatment. Dr. Yapa testified that the medication and structured

environment of the institution might serve to suppress C.J.'s aggressive tendencies and the compulsion to act on his delusions. By alleviating some of the symptoms of C.J.'s mental disorder, the treatment program might make his illness more manageable. This is far different from the *Athans* testimony which concluded that a treatment program would not cause any change in the disorders of the two subjects. We are satisfied that the *Athans* case involved two people who might be helped in terms of maximizing their individual functioning and maintenance, even though they could not be helped in controlling or improving their disorders. In this case, we have evidence that C.J. will benefit from treatment that will go beyond controlling his activity—it will go to controlling his disorder and its symptoms. As such, *Athans* is inapposite to this case. We conclude that the jury instruction given in this case is not contrary to sec. 51.01(17), Stats.

*By the Court.*—Order affirmed.