# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP46-FT |
| COMPLETE TITLE: | In the matter of the mental commitment of J.W.J: |
| | |
| | Waukesha County, |
| |       Petitioner-Respondent, |
| |   v. |
| | J.W.J., |
| |       Respondent-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 370 Wis. 2d 262, 881 N.W.2d 359
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 8, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 17, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Waukesha |
|   JUDGE: | William Domina |

| | |
|---|---|
| JUSTICES: | |
|   SEPARATE WRITING: | ABRAHAMSON, J. writes separately, joined by A.W. BRADLEY, J. |
|   CONCURRED: | |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by and an oral argument by *Kaitlin A. Lamb*, assistant state public defender.

For the petitioner-respondent, there was a brief filed by and oral argument by *Robert J. Mueller*, corporation counsel.

2017 WI 57

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2016AP46-FT
(L.C.   2009ME1158)
No.

STATE OF WISCONSIN                    :          IN SUPREME COURT

**In the matter of the mental commitment of J.W.J:**


**Waukesha County,**                                   **FILED**

          **Petitioner-Respondent,**
                                                **JUN 8, 2017**
     **v.**
                                                Diane M. Fremgen
Clerk of Supreme Court
**J.W.J.,**

          **Respondent-Appellant-Petitioner.**


          REVIEW of a decision of the Court of Appeals.  *Affirmed.*


          ¶1   DANIEL KELLY, J.   The petitioner, J.W.J., is an adult suffering from paranoid schizophrenia.  He is currently subject to an involuntary commitment order and an order requiring him to undergo treatment and take medication prescribed for his condition.  Waukesha County seeks to extend those orders for an

additional year; Mr. J. says further involuntary commitment and treatment will not rehabilitate him, so he is not a proper subject for treatment within the meaning of Wis. Stat. § 51.20(1) (2015-16).[1] We review the unpublished decision of the court of appeals[2] affirming the Waukesha County circuit court's extension of those orders.[3]

## I. BACKGROUND

¶2 Mr. J. is a 55-year-old man who has suffered from mental health or substance abuse issues for most of his life. He has been subject to commitment orders almost continuously from 1990 to 2008, at which time he started an 18-month prison term. Upon release in 2009 he was adjudged so psychotic and threatening to others that he was immediately subjected to a new set of commitment orders that have been in place since then.

¶3 On June 16, 2015, Waukesha County filed a petition to extend Mr. J.'s involuntary commitment and treatment orders. At the time of the petition, Mr. J. was attending his appointments, receiving medication, and living independently in the community. The County's current petition represents the sixth extension of Mr. J.'s commitment and treatment orders.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

[2] In re Mental Commitment of J.W.J., No. 2016AP46, unpublished slip op., (Wis. Ct. App. May 4, 2016).

[3] The Honorable William Domina presiding.

¶4 Mr. J.'s medical records provide a sense of his longstanding, continual struggles from his youth up through 2014:

Mr. J[4] has a lengthy history of drug and alcohol abuse. Marijuana, LSD and barbiturates abuse started at the age of 15 if not earlier. In 1979, at the age of 17, he experienced an LSD overdose which required treatment at the . . . Child and Adolescent Center. He was diagnosed with Drug Induced Schizophrenia.

[I]n-patient treatment periods extend from 1980 through 2014 . . . ; approximately 12 psychiatric admissions to the [Mental Health Center]. Additionally, psychiatric treatment at the . . . Resource Center during his incarceration.

Mr. J. has a history of criminal behaviors over the years including car theft, robberies, two DWI, burning down a field as well as a 2008 conviction for selling marijuana out of a [store] . . . he ran in [a certain municipality]. His prison sentence was 18 months. During this period of time he became quite upset and wrote a threatening letter to his mother as well as [a] sexually explicit letter to the female warden. Mr. J was committed in 2009 . . . [and] has been under commitment almost consistently since 1990.

Over the course of mental health treatment Mr. J. has shown a significant lack of insight into his mental illness and a lengthy history of not cooperating with taking psychiatric medications. Many of his hospitalizations occurred after a period of refusing medications with the expected results that Mr. J. became increasingly more paranoid, rambling/pressured speech, sleep problems, often times experiencing command-type auditory hallucinations to kill himself or others along with depression and/or agitated

---

[4] As submitted to the court, the medical records redact all but the first letter of Mr. J.'s last name, a convention we follow without noting every instance in which we engage in such elision.

behaviors.   Significant alcohol usage has also continued over the years.  Mr. J. continues to insist that it is the psychotropic medications which causes all of his mental health symptoms.

The last hospitalization . . . 3/1/14 to 3/27/14 occurred after he was taken by the Sheriff's Department to get his IM [intramuscular] injection which he had previously refused to get.  Mr. J. was noted by the attending MD to be rambling and bizarre.  Patient complained of "the beast" throwing glass around his apartment.  He wanted the police to get him a tank and bombs so that he could kill the beast.  He was then admitted to the [Mental Health Center].[5]

¶5   The Recommitment Report filed along with the County's petition to extend Mr. J.'s commitment described Mr. J.'s status in 2015:[6]

Mr. J. is making his appointments and is receiving his IM medication.  He has been [sic] maintained his current housing and remains [in] the community.  There [have] been no inpatient hospitalizations this past year.  Mr. J. is experiencing a number of medical problems which may be due to his current medication. . . .   His diagnoses are Axis I Schizophrenia, Alcohol Use Disorder and History of Cannabis Use Disorder.  He continues to state he is allergic to all psychotropic medication.  He at the last shot appointment said the medication makes him

---

[5] This material comes from a Report of Examination (dated July 1, 2015) prepared by Dr. Richard J. Koch.  Doctor Koch is a licensed psychologist and has seen Mr. J. on five occasions between 1990 and 2004.  He also performed an assessment of Mr. J.'s condition in 2014, although he had to rely on medical records and other generally available information because Mr. J. refused a personal examination.  Dr. Koch submitted this Report in support of the County's petition to extend Mr. J.'s involuntary commitment.

[6] This report was submitted by Mr. Robert C. Walker, LCSW, on behalf of the Waukesha County Community Human Services Department.

4

feel like he is being murdered every night. Given the medication changes being made and Mr. J's lack of insight into his illness [the advanced practice nurse prescriber] is requesting an extension of the current commitment.

¶6 Doctor Koch tried to personally examine Mr. J. in 2015 in connection with his involuntary commitment but could not because Mr. J. would not allow it: "Mr. J. contacted this examiner by telephone and he quickly stated that he would not cooperate in a personal interview and he would not answer questions over the telephone. Mr. J. disconnected the call prior to this examiner being able to read him his rights." Consequently, Dr. Koch based the Report on Mr. J.'s existing medical records and other information he was able to assemble without a personal examination.

¶7 Dr. Koch's evaluation resulted in this assessment:

This past treatment year Mr. J. has not been hospitalized. He has maintained his current housing and remains in the community. Mr. J. has been compliant with psychotropic medications but he has stated that he is "allergic" to all psychotropic medications. He continues to show lack of insight into his illness.

Dr. Koch checked the boxes in the Report that indicate it was his opinion, to a reasonable degree of professional certainty, that Mr. J. is mentally ill,[7] dangerous,[8] is an appropriate

---

[7] The form defines "mentally ill" as "a substantial disorder of thought, mood, perception, orientation or memory which grossly impairs judgment, behavior, capacity to recognize reality, or the ability to meet the ordinary demands of life."

5

subject for outpatient treatment, and that psychotropic medication would be therapeutically valuable to him. Dr. Koch also wrote that Mr. J.'s mental illness makes him "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives in order to make an informed choice as to whether to accept or refuse psychotropic medication." Dr. Koch concluded that "[t]here is nothing in [Mr. J.'s] record to suggest there has been any significant change in his status. He continues to be a patient who has a history of improved behaviors when appropriately medicated and deterioration in the ability to function in the community when not appropriately medicated."

¶8 At the hearing on the County's petition to extend Mr. J.'s commitment, Dr. Koch testified consistently with his report. In particular, he said Mr. J.'s schizophrenia is treatable "to the extent that when treated with medications . . . his behavior is improved and he can survive in the community." He explained that this treatment lessens the disordering of Mr. J.'s thought, mood, and perception.

¶9 Dr. Koch also explained why he believes Mr. J. is dangerous. He testified that Mr. J.'s "history is one of inconsistent utilization of psychotropic medications. When he's

---

[8] Dr. Koch checked the box on the form that expresses his belief that Mr. J. is dangerous because "[t]here is a substantial likelihood, based on this individual's treatment record, that this individual would be a proper subject for commitment if treatment were withdrawn."

not appropriately medicated, he becomes increasingly more agitated, paranoid, grandiose at times, and he started having hallucinations, demand hallucinations to either harm himself or others." However, "[w]hen he's taking medications, while some of those experiences and symptoms may still be present, he doesn't act on them."

¶10 Doctor Koch said he does not believe Mr. J. would take his medications absent a court order to do so: "[T]he current evidence from the extension report as well as my prior history with him and his behaviors indicates that when not ordered to take psychotropic medications that he doesn't do it." And without his medications, Dr. Koch said, Mr. J. would require confinement for inpatient care.

¶11 When the hearing concluded, the circuit court granted the County's petition. It found that Mr. J. continues to suffer from a mental illness (in the form of paranoid schizophrenia), he is a proper subject for treatment and benefits from it, he can function in the community in large part because of this treatment, and he satisfies the definition of "dangerousness" because if treatment were to cease, he would be a proper subject for commitment. The court extended Mr. J.'s involuntary commitment order for 12 months. It also extended the medication and treatment order, which requires Mr. J., inter alia, to attend his appointments, take his medications as prescribed, not engage in any acts or attempts or threats to harm himself or others, and not take any non-prescription controlled substances or alcoholic beverages.

7

¶12 The court of appeals, in a concise opinion, affirmed the circuit court in all respects. The court of appeals applied the analytical framework we described in Fond du Lac County v. Helen E.F., 2012 WI 50, 340 Wis. 2d 500, 814 N.W.2d 179, and found that because Mr. J. has rehabilitative potential, he was a "proper subject of treatment."

¶13 We granted Mr. J's petition for review and now affirm.

## II. STANDARD OF REVIEW

¶14 This case requires us to interpret provisions of Wis. Stat. ch. 51. While our review of questions of law is independent from the circuit court and court of appeals, we benefit from their analyses. State v. Steffes, 2013 WI 53, ¶15, 347 Wis. 2d 683, 832 N.W.2d 101.

¶15 We must also review whether the County has met its burden of proof to support extension of Mr. J.'s commitment. This presents a mixed question of law and fact. We uphold a circuit court's findings of fact unless they are clearly erroneous. K.N.K. v. Buhler, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987). Whether the facts satisfy the statutory standard is a question of law that we review de novo. Id.

## III. ANALYSIS

¶16 Mr. J. wishes to live his life free of Waukesha County's commitment and medication orders because he believes they have brought him as much rehabilitation as they are capable of bringing. Waukesha County, however, says that Mr. J.'s

8

condition will deteriorate if the orders lapse, making him a danger to himself and those around him.

¶17 There is, of course, an inherent tension between the public's interest in involuntarily treating an individual and that individual's liberty interest.[9] On the treatment side, the people of Wisconsin have recognized the challenges that mental illness, developmental disabilities, and substance abuse present——both to the public and the individuals suffering from such disorders. So "[i]t is the policy of the state to assure the provision of a full range of treatment and rehabilitation services . . . for all mental disorders and developmental disabilities and for mental illness, alcoholism and other drug abuse." Wis. Stat. § 51.001(1).

¶18 However, not all who could benefit from such services will partake of them. And of those who will not, there will be a subset whose condition will make them dangerous——either to themselves, or to others. To ward against the danger their condition presents, our statutes provide for involuntary commitment when: "1. The individual is mentally ill or . . . drug dependent or developmentally disabled and is a

_____

[9] See, e.g., Addington v. Texas, 441 U.S. 418, 425 (1979) (A "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); In re Melanie L., 2013 WI 67, ¶43, 349 Wis. 2d 148 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." (Quoting Washington v. Harper, 494 U.S. 210, 229 (1990))).

proper subject for treatment[; and] 2. The individual is dangerous . . . ." Wis. Stat. § 51.20(1).

¶19 Because of the liberty interests affected by involuntary commitment, public policy favors outpatient treatment whenever possible: "To protect personal liberties, no person who can be treated adequately outside of a hospital, institution or other inpatient facility may be involuntarily treated in such a facility." Wis. Stat. § 51.001(2). Indeed, the court must use the least restrictive means of delivering effective treatment: "There shall be a unified system of prevention of such conditions and provision of services which will assure all people in need of care access to the least restrictive treatment alternative appropriate to their needs . . . ."  § 51.001(1). Further circumscribing the imposition on an individual's liberty, the initial commitment order may not exceed six months. Wis. Stat. § 51.20(13)(g)1. And the order may not issue at all unless the county can establish the required elements with clear and convincing evidence. § 51.20(13)(e).

¶20 Upon each petition to extend a term of commitment, a county must establish the same elements with the same quantum of proof. Helen E.F., 340 Wis. 2d 500, ¶20. However, it may satisfy the "dangerousness" prong by showing "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Wis. Stat. § 51.20(1)(am). An order

extending involuntary commitment may not exceed one year. § 51.20(g)1.

### A. Mr. J.'s challenge

¶21 Mr. J.'s challenge is a narrow one——he does not dispute his mental illness or his dangerousness, only that he is a "proper subject of treatment" within the meaning of Wis. Stat. § 51.20(1).[10] "Treatment," in this context, carries a specialized meaning. It comprises "those psychological, educational, social, chemical, medical or somatic techniques designed to bring about rehabilitation of a mentally ill, alcoholic, drug dependent or developmentally disabled person." Wis. Stat. § 51.01(17) (emphasis added).

¶22 And so we arrive at the heart of Mr. J.'s argument——he does not believe he can be rehabilitated. If he cannot be rehabilitated, he cannot be a proper subject of treatment or an involuntary commitment order. Our focus, therefore, is on the meaning of "rehabilitation."

¶23 As Mr. J. acknowledges, this is not the first time we have had to address this statutorily-undefined term. In Helen E.F. we separated treatments into two camps: Those that bring

---

[10] Mr. J. questions only whether he is a "proper subject for treatment." Because he does not argue he is not mentally ill or dangerous within the meaning of Wis. Stat. § 51.20(1), we understand he has conceded those issues. See Racine Steel Casings, Div. of Evans Products Co. v. Hardy, 144 Wis. 2d 553, 557 n.1, 426 N.W.2d 33 (1988) (stating that where an issue "was neither briefed nor argued before the court in oral argument, we do not address this issue").

11

about rehabilitation, and those that do not.  We said we could recognize the former by their ability to control the disorder in question:

> If treatment will maximize the individual functioning and maintenance of the subject, but not help in controlling or improving their disorder, then the subject individual does not have rehabilitative potential, and is not a proper subject for treatment. However, if treatment will go beyond controlling activity and will go to controlling the disorder and its symptoms, then the subject individual has rehabilitative potential, and is a proper subject for treatment.

Helen E.F., 340 Wis. 2d 500, ¶36 (citing C.J. v. State, 120 Wis. 2d 355, 362, 354 N.W.2d 219 (Ct. App. 1984) (internal alterations, quotations, and citations omitted)).

¶24 Mr. J. asserts that this understanding of "rehabilitation" cannot properly account for some of the unique characteristics of paranoid schizophrenia, which deficiency can lead to an inaccurate conclusion that the individual is a proper subject of treatment. Specifically, he assigns four weaknesses to our framework:

1. When evaluating a patient with paranoid schizophrenia, it is difficult to decide whether a treatment is controlling "behaviors" as opposed to "symptoms."

2. Our analysis does not say which, or how many, symptoms the treatment must be able to control before we deem the patient to have rehabilitative potential.

3. Picking up on a concern discussed by the concurring opinion in Helen E.F., Mr. J. says our analysis is

12

sufficiently imprecise that a physician's word choice (as opposed to the patient's actual condition) could be the deciding factor in concluding a person is a proper subject for treatment.

4. Again referring to a concern raised in the <u>Helen E.F.</u> concurring opinion, Mr. J. worries we might determine rehabilitative potential based on the general characteristics of a class of disorder, as opposed to focusing on the symptoms and condition of the individual patient who is the subject of the involuntary commitment petition.

¶25 Based on these perceived deficiencies, Mr. J. asks us to modify our Helen E.F. framework for understanding "rehabilitation" as follows:

> If treatment will maximize the individual functioning and maintenance of the subject, but not help in ~~controlling or~~ improving their disorder, then the subject individual does not have rehabilitative potential, and is not a proper subject for treatment. However, if treatment ~~will go beyond controlling activity and~~ will go to ~~controlling~~ <u>improving</u> ~~the~~ <u>his or her</u> disorder ~~and its symptoms~~, then the subject individual has rehabilitative potential, and is a proper subject for treatment.[11]

¶26 We revisit <u>Helen E.F.</u> to determine whether its logic is supple enough to accurately evaluate whether someone suffering from a condition like paranoid schizophrenia is capable of rehabilitation within the meaning of Wis. Stat.

---

[11] Strikethroughs represent Mr. J.'s proposed deletions, while underlined material represents proposed additions.

13

§ 51.20(1). In doing so, we will consider each of Mr. J.'s concerns in turn.

## IV. POTENTIAL MODIFICATIONS OF HELEN E.F. FRAMEWORK

### A. "Behaviors" versus "Symptoms"

¶27 Mr. J.'s first argument that Helen E.F. cannot appropriately distinguish between rehabilitative and non-rehabilitative treatments relies on some rhetorical prestidigitation. In Helen E.F., we juxtaposed treatments affecting nothing more than an individual's "activities" with those that affect "symptoms." We said only the latter are rehabilitative. Mr. J. responds that "activities" are really no different from "behaviors," and so one may just as readily ask whether there is any difference between treatments affecting "behaviors" and those affecting "symptoms." If there isn't, he says, then Helen E.F.'s explanatory power is an illusion.

¶28 To turn "activity" (the word we used in Helen E.F.) into his preferred term, "behavior," he notes that the American Psychiatric Association says "[s]chizophrenia is characterized by delusions, hallucinations, disorganized speech and behavior, and other symptoms that cause social or occupational dysfunction." Referring to an online dictionary, he finds "behavior" defined as an "observable activity in a human or animal." From this he concludes that, if schizophrenia manifests (at least in part) as a behavior, and a behavior is an activity, then he may safely substitute "behavior" for "activity" in the Helen E.F. framework. The transitive

14

principle, however, functions much more neatly in mathematics than it does in semantics.

¶29 Mr. J. certainly has reason to attempt this dictional substitution. Doctor Koch frequently referred to Mr. J.'s behavior when describing the effectiveness of the treatment he was receiving under the involuntary commitment order. By melding behaviors and activities, Mr. J. can then challenge us to describe how a behavior might differ from a symptom.

¶30 Assuming we would be unable to rise to this challenge, Mr. J. proposes we eliminate any reference to activities or symptoms from the assessment of rehabilitative potential. He invites us, instead, to inquire only into whether the treatment would improve his disorder. By the phrase "improve his disorder," we take Mr. J. to mean that treatment would need to continually improve his condition until he experiences either a cure or a plateau beyond which no further improvement is possible.[12] We decline this invitation.

¶31 Furthermore, we decline Mr. J.'s challenge to find a distinction between "behaviors" and "symptoms" because its premise is invalid. The proper disjunctive categories in Helen E.F. are "activities" and "symptoms," and we can tell them

---

[12] We also understand Mr. J.'s position to be that if he reaches a plateau beyond which no further improvement is possible, he may no longer be subjected to involuntary commitment. This makes sense when withdrawal of treatment would not inevitably result in the deterioration of his condition. However, as we discuss in part IV.E., this is not Mr. J.'s circumstance.

15

apart. When we developed the framework for determining whether someone has rehabilitative potential we leaned heavily on C.J. The court of appeals in that case juxtaposed "habilitation" and "rehabilitation." The former relates to the control of activities:

> [H]abilitation is more closely related to daily living needs and skills than to treatment of a particular disorder. A practical definition of habilitation would include eating, dressing, hygiene, minimum social skills and such other things that facilitate personal maintenance and functioning. Habilitation is a concept frequently associated with the long-term care of the developmentally disabled. It is possible that controlling a person's activities by restricting his or her freedom and putting him or her on a carefully defined regimen would be part of a habilitation program.

C.J., 120 Wis. 2d at 359-60.

¶32 Rehabilitation, on the other hand, addresses the control of symptoms. It comprises "treatment going beyond custodial care to affect the disease and symptoms . . . ." Id. at 360. But rehabilitation is not synonymous with cure. Id. And it "has a broader meaning than returning an individual to a previous level of function." Id. Thus, "[a]n individual with an incurable physical or mental illness or disability may still be considered capable of rehabilitation and able to benefit from treatment in the sense that symptoms can be controlled and the ability to manage the illness ameliorated." Id.

¶33 To the extent we need to find a lexical home for "behavior," we conclude it most comfortably resides in the

16

"symptom" side of our analytical dichotomy.[13] The C.J. court described "behaviors" as the immediate consequences of C.J.'s symptoms. The psychiatrist said "the primary symptom" of C.J.'s paranoid schizophrenia "is recurrent delusions." Id. at 357. He then observed that these delusions "impair his judgment and behavior." Id. Impaired behavior was the direct consequence of C.J.'s primary symptom. When we addressed Helen E.F.'s condition, "behavior" carried the same significance. She suffered from Alzheimer's Disease, the symptoms of which included "progressive dementia, memory loss, the inability to learn new information, and limited verbal communication." Helen E.F., 340 Wis. 2d 500, ¶3. Her resulting behavior included agitation and aggression. Id., ¶4.

¶34 By contrast, "activities" (which the C.J. court equated to those things addressed by habilitation) relate to functional capabilities such as "eating, dressing, hygiene, minimum social skills and such other things that facilitate personal maintenance and functioning." C.J., 120 Wis. 2d at 360. In Helen E.F. we found that Helen's treatment could not

---

[13] A "symptom" is "any morbid phenomenon or departure from the normal in structure, function, or sensation, experienced by the patient and indicative of disease." Symptom, Stedman's Medical Dictionary (28th ed. 2006).

reach her primary symptoms.[14] Instead, it could "maximize [only] her functioning and maintenance." Helen E.F., 340 Wis. 2d 500, ¶37 (internal marks omitted). The court of appeals maintained the same distinction in Milwaukee County Combined Community Services Board v. Athans, describing habilitation (control of activities) as treatment "which assist[s] an impaired person's ability to live in the community," whereas rehabilitation (control of symptoms) "ameliorate[s] impairments and facilitate[s] an individual's capability to function." 107 Wis. 2d 331, 336, 320 N.W.2d 30 (Ct. App. 1982) (quoting U.S. Dep't of Health, Ed. and Welfare, Health Planning Taxonomy 4 (1979)).[15]

---

[14] We did observe, however, that medication could ameliorate Helen E.F.'s anxiety and aggression. Fond du Lac Cty. v. Helen E.F., 2012 WI 50, ¶38, 340 Wis. 2d 500, 814 N.W.2d 179. But these behaviors were incidental to the analysis because controlling them had no effect on her dementia, memory loss, or any of her other primary symptoms. Thus, controlling these incidental behaviors could not establish a basis for rehabilitative potential.

[15] Athans' reference to an individual's "capability to function," at first take, appears to blur the distinction between rehabilitative and habilitative treatments. In context, however, the line holds. Resorting to a Department of Health, Education and Welfare document that has nothing to do with our statutory structure was perhaps not the most helpful source of authority. But the Athans court was juxtaposing the same concepts we are distinguishing here. So the quote could best be understood as recognizing that the amelioration of impairments (symptoms) will have the effect of improving the patient's capability to function (his activities). The key is that the rehabilitative treatment addresses itself to the symptom, not the activities.

18

¶35 Ultimately, the distinction we draw between rehabilitation and habilitation depends on whether the focus of the treatment is endogenous to the patient (symptoms) or exogenous (activities). A symptom is an expression of the disorder at work within the patient. It is the symptom itself that is harmful, and because it manifests from within, it is endogenous. On the other hand, an inability to engage in a specific activity, such as feeding oneself, grooming, dressing, etc., focuses on the manipulation of something exogenous to the patient—food, clothes, washing implements, and so on. The patient suffers harm because he cannot turn those external things to his benefit.

¶36 Habilitation, therefore, refers to interventions that help a patient put exogenous things to his benefit (that is, activities). Rehabilitation, to the contrary, refers to improving the patient's condition through ameliorating endogenous factors such as symptoms and behaviors. That is why we said in Helen E.F. that "if treatment will go beyond controlling activity and will go to controlling the disorder and its symptoms, then the subject individual has rehabilitative potential, and is a proper subject for treatment." 340 Wis. 2d 500, ¶36 (internal alterations, quoted source, and quotation marks omitted). Because we are able to distinguish between activities and symptoms, this part of Mr. J.'s argument does not disclose a need to modify the Helen E.F. analytical framework.

B. How Many Symptoms Must a Treatment Control?

¶37 Mr. J. also says we should modify the Helen E.F. framework because we were not especially precise in determining which symptoms a treatment must be able to control before we conclude a patient has rehabilitative potential. Specifically, he notes we provided no qualifier for the term "symptoms" in the test we adopted, did not say whether the controlled symptoms had to be the most obvious or disabling ones, and did not quantify the number of symptoms a treatment must control. When we referred to Helen E.F.'s condition, we said "there is uncontroverted evidence that Helen's underlying disorder, Alzheimer's Disease, as well as the vast majority of its symptoms, do not respond to treatment techniques . . . ." Id., ¶38 (emphasis added). Mr. J. concludes from this that our framework requires the treatment to leave less than the "vast majority of [the disorder's] symptoms" unimproved, but how much less is an open question.

¶38 This is a fair observation. We provided no such measure, however, because none was necessary. The expert testimony in Helen E.F. demonstrated that Alzheimer's Disease "is incurable and untreatable; the only available medical remedy is maintenance——not treatment——of the disease as it progresses." Id., ¶37. We concluded that "medical techniques can only maximize the functioning and maintenance of an individual" suffering from this disorder. Id. (internal alterations and quotations omitted). So treatment would reach only habilitative matters. The only symptoms/behaviors we were told could be

20

affected by medical treatment were her anxiety and aggression. These, however, were secondary to her primary symptoms: progressive dementia, memory loss, the inability to learn new information, and limited verbal communication. Medical treatment could not reach any of these. All treatment could do was palliate some of the minor aspects of her condition. So it was apparent she did not have rehabilitative potential.

¶39 There may come a day when we need to quantify and qualify the symptoms a treatment must reach before concluding a patient has rehabilitative potential. But this is not that day.

¶40 The uncontroverted facts show that Mr. J. has rehabilitative potential. Doctor Koch said Mr. J.'s paranoid schizophrenia was a "substantial disorder of his thought, mood, and perception" that "grossly impair[s] his judgment and behavior." Mr. J. expresses these disorders by becoming "agitated, paranoid, grandiose at times," with "demand hallucinations to either harm himself or others." The treatment he receives lessens the disordering of his thought, mood, and perception. And while some of these experiences and symptoms may still be present while under treatment, he does not act on them. In fact, his treatment is so effective at controlling his symptoms that he can live in society while taking his treatment as an outpatient. Doctor Koch said that, without treatment, Mr. J.'s condition would inevitably decline to the point he would have to be confined so he could receive inpatient treatment.

¶41 The policy of this State is to provide treatment in "the least restrictive alternative appropriate to" a patient's

needs. Wis. Stat. § 51.001(1). If a treatment controls symptoms to such a degree that withdrawing it would subject the patient to a more restrictive treatment alternative, then the treatment controls enough symptoms to establish the patient has rehabilitative potential. The court of appeals said in C.J. that rehabilitation "has a broader meaning than returning an individual to a previous level of function," 120 Wis. 2d at 360, so simple logic requires that it means at least that. If treatment is withdrawn, Mr. J.'s symptoms will worsen to the point that a more restrictive level of care would be necessary (confinement for inpatient treatment); reintroduction of treatment would return him to the previous level (treatment as an outpatient). It is enough that treatment can accomplish this to demonstrate the patient has rehabilitative potential. Thus, to resolve this case, there is no need to identify the number or significance of the symptoms the treatment controls.

### C. Dispositive Word Choices

¶42 Mr. J. is also concerned that our Helen E.F. framework may lead to outcomes that turn not on medical prognosis, but on the words a physician may choose to describe his patient's condition and prospects. The concurring opinion in Helen E.F. described that very risk:

> The individuals in the two cases [C.J. and Athans] suffered from the same condition——chronic paranoid schizophrenia——yet the two courts reached opposite results on the possibility of "rehabilitation." The results appear driven by the words chosen by expert medical witnesses describing the impact various medications would have on the individual.

22

Helen E.F., 340 Wis. 2d 500, ¶51 (Abrahamson, J., concurring).

¶43 This is certainly a legitimate concern. But it arises not from the need to distinguish between symptoms and activities, but from the need to make distinctions based on expert medical testimony at all. If we adopt Mr. J.'s revision to our framework, we would not cease making such distinctions. We would simply shift to distinguishing between treatments that improve a patient's disorder and those that do not. Expert medical testimony, of course, would guide us in that task. So if we are currently at risk of deciding wrongly because of the vagaries of an expert's choice of words, Mr. J.'s proposed change will do nothing to protect us. It would just give us an opportunity to err in making a different distinction.

D.   Group versus Individualized Determinations

¶44 Finally, Mr. J. believes we need to emphasize that the Helen E.F. framework inquires into whether the specific patient at issue has rehabilitative potential. That is to say, he wants to ensure we are not developing a taxonomy of ailments, one branch of which comprises conditions that have rehabilitative potential, while the other branch contains those that do not. He again finds expression of his concern in the Helen E.F. concurring opinion:

> A tension exists in the texts of the statutes [Chapters 51 and 55] (and the application of the statutes) between on the one hand lumping together all people with a certain condition and on the other hand considering the symptoms and conduct of the individual. The tension between the more rigid categories of people with a certain condition and the

23

> more flexible behavioral standards is palpable in the majority opinion. Does this opinion govern all Alzheimer's patients or only Helen E.F.?

340 Wis. 2d 500, ¶47 (Abrahamson, J., concurring).

¶45 We can see the genesis of Mr. J.'s concern. In Helen E.F. we described Alzheimer's Disease as "incurable and untreatable; the only available medical remedy is maintenance——not treatment——of the disease as it progresses." Id., ¶37. This is a categorical statement and strongly suggests that, because of the nature of Alzheimer's Disease and the state of medical science, no one suffering from that condition has rehabilitative potential. While that may be true as a medical matter (emphasis on "may"), it does not mean that our Helen E.F. framework countenances the automatic relegation of such patients to the non-rehabilitative category.

¶46 Our analysis explicitly requires an inquiry into each individual's condition and potential for rehabilitation. It is, in fact, shot through with references to the individual:

> If treatment will maximize the individual functioning and maintenance of the subject, but not help in controlling or improving their disorder, then the subject individual does not have rehabilitative potential, and is not a proper subject for treatment. However, if treatment will go beyond controlling activity and will go to controlling the disorder and its symptoms, then the subject individual has rehabilitative potential, and is a proper subject for treatment.

Id., ¶36 (emphasis added; internal alterations and quotations omitted). There is always hope that seemingly intractable conditions like Alzheimer's Disease may someday become tractable. Our standard for determining rehabilitative

24

potential does not foreclose that possibility. We evaluate each individual individually.

### E.   Clear and Convincing Evidence

¶47 Mr. J. says the County did not establish he is a proper subject of treatment under either the Helen E.F. rubric or his proposed revision. His objection is largely that his disorder is not continuing to improve. He acknowledges he is not getting worse but asserts that unless treatment is continually improving his condition, he does not have rehabilitative potential. He does not say why this should be so, and no supporting rationale immediately suggests itself.

¶48 As we discussed at length, supra, Mr. J.'s treatment is achieving laudable results. Currently, he can integrate in society while receiving his treatment as an outpatient. Without treatment, his condition will deteriorate to the point that an involuntary commitment order will subject him to confinement so he can receive treatment as an inpatient. If we adopted Mr. J.'s argument, we would condemn him to a never-ending yo-yo of uncontrolled paranoid schizophrenia, followed by involuntary confinement for inpatient treatment until his symptoms are controlled and his inpatient commitment order is lifted, followed by another bout of uncontrolled paranoid schizophrenia, and on and on ad mortem. Nothing in law or logic instructs us

to ignore this reality, so we will not.[16] The County provided clear and convincing evidence that treatment controls Mr. J.'s symptoms to such an extent that he can integrate into society without posing a threat to himself or others and that withdrawal of treatment would eventually require his confinement so he could receive inpatient treatment. Consequently, the evidence is sufficient to demonstrate Mr. J. is a proper subject of treatment within the meaning of Wis. Stat. § 51.20(1).

## V. CONCLUSION

¶49 Mr. J. did not challenge the circuit court's factual findings, and both the circuit court and the court of appeals properly applied Helen E.F. to conclude Mr. J. is a proper subject of treatment because he has rehabilitative potential. Consequently, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[16] Mr. J. also asserted he should not be subject to an involuntary commitment order because Chapter 51 is meant to be used for "short term treatment and rehabilitation intended to culminate with re-integration of the committed individual into society," and he has already been subject to such orders continuously since 2009. Presumably, Mr. J. meant this observation to support his bid to be free of Waukesha County's orders. However, this might instead suggest he would be a candidate for involuntary, long-term protective placement under Wis. Stat. ch. 55. But because he did not develop this argument and no one has briefed how chapters 51 and 55 complement (or don't complement) each other, we will not consider it here. See Clean Wisconsin, Inc. v. Pub. Serv. Comm'n of Wis., 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments.").

¶50 SHIRLEY S. ABRAHAMSON, J. I renew my concern that the Helen E.F. case set forth a confusing and unpredictable test to interpret a "proper subject for treatment" under Chapter 51. Fond du Lac County v. Helen E.F., 2012 WI 50, 340 Wis. 2d 500, 814 N.W.2d 179. The instant opinion continues and possibly magnifies the problem.

¶51 In Helen E.F., this court analyzed and compared Chapters 51 and 55 of the Wisconsin Statutes. Despite the fact that Chapters 51 and 55 ostensibly serve different purposes, there is substantial overlap and similarity between some aspects of the two chapters. Helen E.F., 340 Wis. 2d 500, ¶45 (Abrahamson, C.J., concurring).

¶52 But one important and undisputed distinction between Chapters 51 and 55 is the length of the treatment or commitment that each chapter provides. Mr. J. has been under Chapter 51 for almost a decade. Although an initial Chapter 51 commitment cannot exceed six months and extensions are possible, Wis. Stat. § 51.20(13)(g), Chapter 55 applies to a commitment caused by "a disability that is permanent or likely to be permanent." § 55.08(1)(d). See Helen E.F., 340 Wis. 2d 500, ¶¶29, 44. The majority opinion, ¶48 n.16, slides over this issue.

¶53 This distinction matters. Although both provide for involuntary commitments, Chapter 55 contains numerous additional

procedures and protections for an individual subject to a long-term commitment that Chapter 51 simply doesn't.[1]

¶54 Because the court is faced with interpreting and applying Chapter 51 to Mr. J., I briefly restate my concerns with the Helen E.F. test.

¶55 Although I agree with the majority opinion that Mr. J.'s suggested revisions of the Helen E.F. test are unavailing, I remain concerned that the Helen E.F. tests is also unavailing.

¶56 "Rehabilitation" appears to be the linchpin of this statutory definition. See Milwaukee Cty. Combined Cmty. Servs.

---

[1] See also Wisconsin Coalition for Advocacy, Rights & Reality II, An Action Guide to the Rights of People with Disabilities in Wisconsin 342 (2001):

> In general, Chapter 55 is used for long-term placement or services while Chapter 51 is used for more time-limited treatment.
>
> . . . .
>
> This is a helpful way to separate the two statutes, but there will be many situations where they overlap. For example, a person with a permanent disability like mental retardation would ordinarily receive services under Chapter 55, but could also have a mental health crisis which would be handled under Chapter 51 with either voluntary or involuntary treatment. Persons with chronic mental illness who are incompetent and have a guardian can probably be served under either Chapter 51 or 55. Some younger persons with severe mental health needs who live in group homes or in their own apartments with intensive services such as Community Support Programs (CSP) may be under Chapter 55 orders. Others in exactly the same situation are under Chapter 51 commitments which are renewed year after year. This varies by county.

Bd. v. Athans, 107 Wis. 2d 331, 334-36, 320 N.W.2d 30 (Ct. App. 1982).

¶57 The line between controlling activity versus controlling the symptoms and the disorder——that is, whether an individual is habilitable or rehabilitable——is not any brighter or clearer to me in the instant opinion than in Helen E.F..

¶58 Unfortunately, the court maintains the confusing test it adopted in Helen E.F., failing to differentiate Chapter 51 commitments from Chapter 55 commitments.

¶59 I renew my suggestion that "it may be time for the legislature to reassess the goals and intended scope of the two chapters." Helen E.F., 2012 WI 50, ¶56 (Abrahamson, C.J., concurring) (citing Wis. Stat. §§ 13.83(1)(c), 13.92(2)(j)).

¶60 For these reasons, I write separately.

¶61 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.