**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 5, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.        2019AP2229-FT**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018ME139

**IN COURT OF APPEALS**
**DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF M. P.:

JEFFERSON COUNTY,

    PETITIONER-RESPONDENT,

  V.

M. P.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Jefferson County: WILLIAM V. GRUBER, Judge. *Affirmed*.

¶1    BLANCHARD, J.[1]    M.P. appeals an order of the circuit court extending her mental health commitment by 12 months under WIS. STAT. ch. 51 and authorizing continued outpatient care with conditions that include involuntary medication as necessary.  M.P. does not dispute that Jefferson County proved by clear and convincing evidence that she is mentally ill and a proper subject for treatment.  *See Portage Cty. v. J.W.K.*, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509 (citing WIS. STAT. § 51.20(1)(a), (am)) (petitioner seeking recommitment must prove by clear and convincing evidence, first, that the individual is mentally ill and a proper subject for treatment and, second, that the individual is dangerous).  M.P.'s argument is that Jefferson County failed to prove by clear and convincing evidence that she is dangerous.  I conclude that the County met its burden of proof and accordingly affirm.

¶2    Whether the facts in the record satisfy the statutory standard for recommitment is a question of law that I review de novo.  *Waukesha Cty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

¶3    As background, I begin by summarizing the events leading to the initial commitment of M.P. that underlies the commitment extension at issue.  In November 2018, a social worker with the Jefferson County Department of Human Services filed a statement of emergency detention in the circuit court that alleged

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). Pursuant to a January 9, 2020 order, the appeal was placed on the expedited calendar and the parties have submitted memo briefs.  *See* WIS. STATE. RULE 809.17.  Briefing was complete on February 20, 2020.  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Separately, M.P. addresses potential mootness, given uncertainty about the timing of the resolution of this appeal challenging a 12-month order issued on May 6, 2019.  I need not address mootness, because the order remains in effect.

the following. M.P. was then receiving services from the Jefferson County Community Support Program (CSP). Two CSP employees, a therapist and the medical director, had reported that M.P. had made statements about shooting a cousin and her husband and burning down a house, after M.P. stopped taking medications as prescribed. Also in November 2018, the circuit court issued an order of commitment for M.P. for a period of six months and an order for involuntary medication and treatment. Before the six-month period expired, in March 2019, the County petitioned for an extension, alleging in part that M.P. "has not taken her psychiatric medications as prescribed" on nine specified dates, "causing an increase of symptoms such as paranoia and avoidant behaviors."

¶4    The court appointed Dr. Jeffrey Marcus, a psychiatrist, to examine M.P. and submit a report on her condition. In April 2019, Dr. Marcus filed a report after performing the following tasks: reviewing treatment records of the CSP and the history of Chapter 51 documentation regarding M.P.; discussing M.P. with CSP staff; and interviewing M.P. He concluded that "there is a substantial likelihood, based on [M.P.'s] treatment record, that [she] would be a proper subject for commitment if treatment were withdrawn."

¶5    Dr. Marcus's report includes the following "Brief History":

> [M.P.] carries the diagnosis of schizophrenia and receives multiple psychotropic agents. She has a chronic history of paranoid ideation, auditory and visual hallucinations, thought disorganization, and impairment of executive functioning. She has a history of numerous past psychiatric hospitalizations. She has an extensive history of treatment non-adherence and has become acutely symptomatic when not taking her medications. Her current commitment stems from an incident in 2018 when she developed homicidal ideation toward her cousin and her cousin's husband. According to CSP staff, this homicidal ideation was associated with acute paranoid ideation.

3

[M.P.] currently resides alone in [city named]. Staff expressed concern about inconsistent oral medication adherence, but she has been consistent with her Abilify Maintena injection.[2] No recent suicidal or homicidal thoughts or behavior have been described. No recent substance abuse was noted in the records.

¶6 Dr. Marcus's report regarding his interview with M.P. included the following observations. While M.P. exhibited a "[t]hought process" that was "mostly organized," she described interactions with and knowledge of her son that appeared to be "hallucinatory and delusional in nature," and her "reality testing appeared poor."[3] M.P. told Dr. Marcus that she "would not suffer negative consequences if she were to stop [taking] her medications." "Chronic impairment of insight and judgment appeared present. Chronic impairment of executive functioning was evident."

¶7 On the topic of dangerousness, Dr. Marcus specifically concluded in his report:

> There is a high likelihood of psychotic decompensation if current treatment were withdrawn. This would result in an increased risk of dangerousness to self and others. Of specific concern would be the emergence of homicidal thoughts and erratic behavior associated with acute psychosis. Her psychotic symptoms are reportedly improved when [she is] adherent to her psychotropic treatment.

¶8 At a circuit court hearing in May 2019, the only witness was Dr. Marcus. Called by the County, he testified consistently with his report, as

---

[2] During testimony in this case, Dr. Marcus explained that Abilify is M.P.'s primary medication to control her mental illness symptoms, which she is to take by injection and orally.

[3] Dr. Marcus testified that, as one would expect, "reality testing" in psychiatry involves assessing the ability of a person to distinguish between reality and delusion.

summarized above.[4]  This included the following, all to a reasonable degree of medical certainty.  M.P. suffered from schizophrenia, which is treatable primarily through antipsychotic medications.  "[D]angerousness would reoccur" if M.P. were to stop taking her medications, causing her to become "increasingly paranoid and disorganized" in her thinking.  Grounds for this conclusion included the following: M.P. was subject to emergency detention in 2018 when she "developed homicidal ideas toward her cousin and her cousin's husband" and M.P. has "a fairly extensive history of not adhering to her treatment," resulting in acute symptoms.  As a result of her mental illness, M.P. was substantially incapable of making an informed choice as to whether to accept or refuse medication.

¶9      On cross examination, Dr. Marcus acknowledged the following:  M.P. had been consistent in receiving injectable medication and perhaps in taking oral medication; she had no hospitalizations or emergency detentions over the prior six months; and there had been no recent homicidal or suicidal thoughts or acts.

¶10     Counsel for M.P. did not attempt to challenge any of Dr. Marcus's testimony during cross examination and acknowledged to the circuit court that Dr. Marcus's "testimony … obviously [is] credible with his credentials."  However, counsel challenged Dr. Marcus's conclusion that "[t]here is a high likelihood of psychotic decompensation."  Counsel argued that this was "just conjecture" because Dr. Marcus "rel[ied] on prior history to make a statement [about] what the future will hold."

¶11     The circuit court credited Dr. Marcus's testimony and concluded that the State had carried its burden.  The court's conclusion rested in part on Dr.

---

[4]  The report was moved into evidence at the hearing without objection by M.P.

Marcus's assessments that M.P. was unable to apply an understanding of the advantages and disadvantages of maintaining treatment and that this presented a risk of dangerousness to herself or others. I agree with the circuit court that, based on Dr. Marcus's testimony and his report, the County carried its burden of proof under the applicable legal standards.

¶12   A county seeking to initiate a Chapter 51 commitment must prove by clear and convincing evidence that the subject is mentally ill, a proper subject for treatment, and presently dangerous. WIS. STAT. § 51.20(1)(a), (1)(am), (13)(e). When, as here, a county seeks to extend a commitment, it can meet its burden of proving dangerousness, pursuant to paragraph (1)(am), by "showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am).

¶13   As M.P. acknowledges, this path to proving dangerousness was created out of recognition that dangerousness "can persist even when the overt behavior or statements that led to … commitment subside." As explained in *J.W.K.*, this path is designed to avoid revolving-door commitments consisting of repeating cycles of dangerousness, followed by treatment, followed by lack of treatment, followed by dangerousness, etc. *See J.W.K.*, 386 Wis. 2d 672, ¶19.

¶14   M.P. makes three arguments, which I address in turn. The first argument is somewhat involved. It is not framed as a constitutional challenge to the substantial likelihood dangerousness test for recommitment in WIS. STAT. § 51.20(1)(am), but it is based on due process. The argument appears to be the following. The legislature could not have intended courts to interpret the substantial likelihood dangerousness test to allow counties to prove dangerousness *absent*

*evidence of dangerous statements or conduct that post-date the original commitment*, because this would violate due process. Under this interpretation, the County failed to carry its burden here because, to establish the potential for actual dangerous conduct, Dr. Marcus exclusively relied on evidence relating to M.P.'s November 2018 statements about shooting a cousin and her husband and burning down a house in preparing his report in April 2019 and testifying in May 2019.

¶15    This argument may involve a concept that we have explained in an unpublished but authored opinion that I consider persuasive. The concept is that WIS. STAT. § 51.20(1)(am) requires proof of *current* dangerousness, even though the statute relieves the State of a burden to show "recent acts" evincing dangerousness. ***Waupaca Cty. v. K.E.K***, 2018AP1887, unpublished slip op., ¶¶37-39 (WI App Sept. 26, 2019). Under this requirement, the petitioner must prove a substantial likelihood that the subject will harm himself or herself or others in the absence of treatment. M.P. may mean to argue that *current* dangerousness cannot be proven through conduct that occurred before commitment. However, she fails to explain why that is so as a matter of logic or of statutory interpretation, or pursuant to any due process jurisprudence or other authority. M.P. provides no reason to think that the nature and timing of dangerous statements or conduct alleged to have pre-dated the original commitment are not simply part of the mix in evaluating whether the petitioner has shown the required "substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am).[5]

---

[5] I do not understand a reference that M.P. includes in this argument to the general rule that courts should attempt to give meaning to each word in a statute. I reject as undeveloped whatever argument is intended.

7

¶16    The second argument is apparently the following. The legislature could not have intended courts to interpret the substantial likelihood dangerousness test to allow counties to prove dangerousness absent evidence of dangerous statements or conduct that post-date the original commitment, because this would create "perpetual extensions of Chapter 51 commitment[s]." Such "perpetual extensions" would "fly in the face of Chapter 55," which provides for long-term care as opposed to short-term care. This argument appears to rest on an unreasonable assumption, namely, that courts will fail to properly assess the nature and timing of dangerous statements or conduct alleged to have pre-dated the original commitment and as a result will "perpetually" grant recommitment petitions based on all such statements or conduct. Put differently, it could be a winning argument against recommitment that dangerous statements or conduct are old enough, weak enough, or otherwise insufficient to support clear and convincing evidence under the substantial likelihood of dangerousness test. However, as I now explain in addressing the third argument, M.P. fails to persuade me that she can prevail under any such argument in this case.

¶17    The third argument generally challenges the sufficiency of the evidence. M.P. contends that the circuit court should have interpreted the substance of Dr. Marcus's testimony to be that "M.P.'s mental health has stabilized and that she's turned over a new leaf," and therefore the County did not provide the required clear and convincing evidence of dangerousness. It is true that various pieces of Dr. Marcus's testimony are favorable to M.P. This includes his acknowledgement of her consistent use of Abilify injections during the current commitment period, the apparent absence of recent suicidal or homicidal thoughts or behavior, and the apparent absence of recent substance abuse. However, it remains that Dr. Marcus understood M.P. to say that she believed that she could stop taking medications

without negative consequences, and that she exhibited "[c]hronic impairment of insight and judgment" and "[c]hronic impairment of executive functioning." These conclusions are striking in light of the November 2018 events, which were serious and were relatively recent as of the time of the recommitment hearing. Further, Dr. Marcus was not impeached in any manner during cross examination and M.P. did not offer any contrary opinions or evidence. In sum, the only evidence presented at the recommitment hearing established, to a level that is clear and convincing, that all of the criteria for extending the commitment were satisfied and that an order for involuntary medication was warranted.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

9