COURT OF APPEALS
DECISION
DATED AND FILED

January 20, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2019AP1950**

Cir. Ct. No.  **2018ME407**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF G. S.:

OUTAGAMIE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,

   PETITIONER-RESPONDENT,

 V.

G. S.,

   RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

¶1      STARK, P.J.[1] George[2] appeals WIS. STAT. ch. 51 orders for involuntary commitment and involuntary medication and treatment. He argues the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Outagamie County Department of Health and Human Services ("the County") failed to present sufficient evidence to show that he was dangerous under WIS. STAT. § 51.20(1)(a)2.c. We conclude the County presented sufficient evidence to establish that George was dangerous. We therefore affirm.

## BACKGROUND

¶2 On November 22, 2018, George was detained pursuant to a statement of emergency detention issued under WIS. STAT. § 51.15. The filing of a statement of emergency detention has the same effect as a petition for involuntary commitment under WIS. STAT. § 51.20. *See* WIS. STAT. § 51.15(5). On November 27, a Green Lake County circuit court judge held a hearing and determined that probable cause existed to believe that George was mentally ill, a proper subject for treatment, and dangerous to himself or others. The court also concluded there was probable cause for the issuance of an involuntary medication and treatment order. At the conclusion of the probable cause hearing, venue was changed from Green Lake County to Outagamie County, where George lived.

¶3 The Outagamie County Circuit Court held a final hearing on December 6, 2018. At the beginning of the hearing, the parties informed the court that the sole contested issue was whether George was dangerous. George stipulated to the other elements required for the entry of an involuntary commitment order—namely, that he was mentally ill and a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1. George also stipulated that the court

---

[2] For ease of reading, we refer to the appellant in this case using a pseudonym, rather than his initials. *See* WIS. STAT. RULE 809.19(1)(g).

could enter an order for involuntary medication and treatment if it concluded the County had established the grounds for involuntary commitment.

¶4    The County called two witnesses to testify at the final hearing. Green Lake County sheriff's deputy Michael Majeskie testified that on November 22, 2018, George called law enforcement stating that he wanted to make a "citizen's arrest on some duck hunters" due to "[s]ome sort of hunting violation" or "trespassing." George told dispatch he was "some anaconda type agent with Donald Trump, and he was going to … take action on that authority." Dispatch then sent Majeskie to George's location at Big Green Lake.

¶5    When Majeskie arrived at the lake, he made contact with five duck hunters on the shore. Majeskie testified the hunters "seemed upset, kind of scared." They told Majeskie that George "just rolled up to them and told them that my name is trouble and I am a federal marshal." George also told the hunters that he was "going to need some backup and people are jamming their cell phone and stuff like that. There's going to be a Mexican standoff with these people over some duck decoys."

¶6    George was in his boat, which was in the water about 100 yards out from the shore, when Majeskie arrived at the lake. George subsequently proceeded to the shore to speak with Majeskie. He told Majeskie that the other hunters were trespassing, and that he had "a deputy federal DNR warden status." George did not, however, provide proof of any law enforcement or governmental authority.

¶7    While speaking to George, Majeskie observed two firearms in George's boat: a shotgun and a rifle. Both guns were encased. Majeskie testified he had told dispatch to instruct George to make sure that his firearms were

unloaded, and when he spoke to George at the scene, George stated "he had done that already." George's response led Majeskie to believe that the firearms had been loaded "at one point."

¶8 Majeskie testified that the type of shotgun George had in his boat was commonly used for bird hunting. He stated the rifle was appropriate for deer hunting, and he acknowledged that his encounter with George occurred during deer hunting season. He testified, however, that it would be "unusual" to use that type of rifle while in a boat in the middle of a lake. He also testified that George specifically told him the rifle was "for protection." Majeskie further testified that during George's confrontation with the hunters, he was "well within shotgun range" and was "[d]efinitely within … rifle range at all times."

¶9 Majeskie ultimately took George into custody based on "criminal charges … for an impersonation issue" and because he was "concerned about [George] being a danger to others." When Majeskie searched George at the jail, he found approximately ten shotgun shells in George's pocket.

¶10 Majeskie conceded that he never saw George holding a firearm during their encounter. He also conceded that he had no knowledge that George had pointed a firearm at anyone on the day in question. He further acknowledged that George's encounter with the hunters was "verbal" in nature and that George did not discharge a firearm while speaking with the hunters.

¶11 The circuit court then questioned Majeskie about George's statement of emergency detention, on which Majeskie wrote that George "has been firing guns into the air causing ammunition to land among residences." Majeskie explained that sentence referred to an incident that had occurred the day before the confrontation with the duck hunters. Although Majeskie was not on duty at that

time, he learned about the incident during a subsequent briefing. When the court asked whether George could have been innocently firing a gun into the air while duck hunting, Majeskie responded:

> I spoke with the DNR warden, who initially took and investigated this complaint. And he advised me that yes, although [George] made the claim he was shooting at ducks, [the warden] didn't think he was. And it was not a safely handled firearm, as the shot was landing amongst homes and vehicles and officers that were arriving on scene to take another complaint.

¶12 The County also presented the testimony of psychiatrist Michele Andrade at the final hearing. Andrade had been appointed by the circuit court to perform an evaluation of George following his emergency detention. The evaluation took place on November 29, 2018, and lasted approximately forty-five minutes. Andrade testified it was difficult to "get a clear history" from George about the confrontation with the hunters "because he was so disorganized." According to Andrade, George "said he was duck hunting. And then he was like making motions that he was firing off a rifle a couple of times." She testified George denied that he believed he was "a federal marshal in the DNR," but he then told Andrade "that he worked for the President of the United States" and that he "was unable to say [the president's] name, because of his secret work for the president."

¶13 When Andrade asked George about his comment to the hunters regarding a "Mexican standoff," George was "very disorganized" and told her he thought it was "odd that there was four of them against me." Andrade testified it was "really hard to follow [George's] train of thought." He made comments about a game warden having a vendetta against him, and he "would go off on something, then he would say 411, 911. And it just didn't make any sense." Andrade

5

testified George confirmed that he was armed during the confrontation with the hunters, and he acknowledged holding a weapon in his hands at some point. Andrade also testified that George described discharging a firearm. However, that description appeared to be in reference to the incident in which ammunition fell on houses, which occurred the day before the confrontation with the hunters.

¶14    Andrade further testified that George told her he had been "chaptered" ten times—referring to prior hospitalizations under WIS. STAT. ch. 51. She opined that George's behavior was consistent with that of someone who was mentally ill. She conceded, however, that George had not demonstrated any dangerous behaviors during his most recent hospitalization.

¶15    The circuit court then questioned Andrade regarding her report. In particular, the court asked Andrade to explain the basis for the conclusion in her report that George was "a danger to himself and others based on [his] past and current history." In response, Andrade stated George told her that he had previously attempted suicide by trying to asphyxiate himself in a garage with his truck running. Andrade also testified George reported that others had told him he had been drinking battery acid. She conceded, however, that the garage incident was not "recent" and that she had no information about when George may have consumed battery acid. In addition, Andrade acknowledged there was no medical evidence substantiating George's recent consumption of battery acid.

¶16    Andrade also stated that George was a danger to others, and possibly to himself, "in terms of this particular episode, having a firearm loaded, firing it, whether it's in the air or not, indiscriminately." Again, though, Andrade conceded that she had no knowledge as to whether George had fired a weapon during his confrontation with the hunters.

6

¶17    Andrade's report contained additional information in support of her conclusion that George posed a danger to himself and others. Specifically, the report stated that George "[d]oesn't feel he has a mental illness and uses poor judgment in terms of his history of non-compliance with treatment where decompensation occurs and dangerous situations happen." The report later stated:

> [George] almost with pride details that he has been hospitalized under [WIS. STAT.] chapter 51 10 times. Then shortly after adds that he will be out of the hospital "in 72 hours." He plans to return to hunting for ducks. Based on his history of multiple hospitalizations and his significant history of non-compliance[,] it is my opinion that he is at high risk to repeat this cycle of decompensation and dangerous behavior if not placed under commitment by the court. He likely is sa[v]vy enough to know how to present to hospital staff in order to evade commitment. As in his rush to be discharged he expects to be discharged in 72 hours. Although he has not shown dangerous behavior while inpatient and no seclusion or restraints[,] he likely is able to present well. This was the case in this interview until as time went on and the interview lengthened[,] he became more and more delusional and disorganized.

¶18    George did not testify or present any witnesses at the final hearing. After hearing arguments by the parties, the circuit court concluded the County had proved by clear and convincing evidence that George was dangerous under WIS. STAT. § 51.20(1)(a)2.c. In support of that conclusion, the court noted that George made a "false representation of having law enforcement authority" during his confrontation with the hunters. While the court did not "read too much into" the report of George shooting into the air, the court found it concerning that George had a rifle during the confrontation with the hunters, given that a rifle is "a gun that's not used for hunting on boats." The court therefore stated George's possession of the rifle was "relevant and probative of the Court looking into the dangerousness issue," along with George's mania and delusional behavior.

¶19    The circuit court acknowledged that the evidence regarding George's confrontation with the hunters was somewhat vague.  The court also noted that it was not concerned about George possessing a shotgun and legitimately hunting ducks.  The court stated, however, that it was "pretty significant" that George had falsely portrayed himself as a law enforcement officer while he was in possession of a gun "that's not used for hunting on a boat."  Based on this evidence, the court concluded the County had established a pattern of recent acts demonstrating that George's judgment was so impaired that there was a substantial probability of physical impairment or injury to himself or others.  *See* WIS. STAT. § 51.20(1)(a)2.c.

¶20    The circuit court acknowledged that the probability of physical impairment or injury under WIS. STAT. § 51.20(1)(a)2.c. is not substantial if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of those services.  The court referred to that statutory language as "almost" shifting the burden onto George to show that he would avail himself of the relevant services.  The court then observed that although George's attorney had represented that George would voluntarily seek treatment for his mental illness, George did not testify, and the court therefore did not know whether he would "follow through with what his lawyer says."  The court subsequently stated that it did not have any information to indicate that George would voluntarily avail himself of services in the community.

¶21    The circuit court therefore entered an order involuntarily committing George on an outpatient basis for a period of six months.  The court also entered an order for involuntary medication and treatment during the period of George's commitment.  George now appeals, arguing the evidence was insufficient to

support the court's orders because the County failed to prove that he was dangerous under WIS. STAT. § 51.20(1)(a)2.c.[3]

## DISCUSSION

¶22    In order to involuntarily commit an individual under WIS. STAT. ch. 51, a petitioner must prove by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See* WIS. STAT. § 51.20(1)(a), (13)(e).  As noted above, in this case, George stipulated that he was mentally ill and a proper subject for treatment.  The only issue on appeal is whether the County presented sufficient evidence to prove that George was dangerous under the standard set forth in § 51.20(1)(a)2.c.[4]

¶23    As relevant here, WIS. STAT. § 51.20(1)(a)2.c. states that an individual is dangerous if he or she "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals."  The term "substantial probability," as used in WIS. STAT. ch. 51, means "much more likely than not."  *See State v. Curiel*, 227 Wis. 2d 389, 414, 597 N.W.2d 697 (1999).  Section 51.20(1)(a)2.c. further provides that "[t]he probability of physical impairment or injury is not substantial … if reasonable provision for the subject individual's protection is available in the community and

---

[3] Both of the orders at issue in this case expired on June 6, 2019.  The County has not sought to extend the orders.  The parties agree, however, that George's appeal is not moot because the commitment order continues to affect George's ability to possess firearms, even though it has expired.  We therefore address the merits of George's appeal.

[4] WISCONSIN STAT. § 51.20(1)(a)2. lists five ways in which a petitioner may establish that an individual is dangerous.  Only the standard set forth in § 51.20(1)(a)2.c. is at issue in this appeal.

9

there is a reasonable probability that the individual will avail himself or herself of these services."

¶24    Whether the County met its burden to prove that George was dangerous presents a mixed question of fact and law. *See Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's factual findings unless they are clearly erroneous. *Id.* However, whether those facts satisfy the statutory standard is a question of law that we review independently. *Id.*

¶25    Although this is a close case, we conclude the County met its burden to prove by clear and convincing evidence that George was dangerous under Wis. Stat. § 51.20(1)(a)2.c. Evidence was introduced at the final hearing that on the day before the confrontation with the hunters, law enforcement received information that George had been firing guns into the air causing ammunition to land among houses. George asserts that he was duck hunting and therefore had a legitimate reason to fire a gun into the air. Be that as it may, the salient point, for purposes of our analysis, is that George was firing his weapon in such a way that ammunition landed among houses, creating a potentially frightening and dangerous situation for their residents.

¶26    The following day, George confronted a group of hunters while in the possession of two firearms. Based on the evidence introduced at the final hearing, it is reasonable to infer that those guns were loaded during the confrontation. Although George was in a boat and was apparently duck hunting at the time of the confrontation, one of the guns in his possession was a rifle not suitable for duck hunting, and George told law enforcement that gun was "for protection."

¶27    George displayed a confrontational attitude during his interaction with the hunters, falsely claiming that he was a federal marshal and telling them that he was going to need "backup" and that there was going to be a "Mexican standoff." George was close enough to shoot or be shot by the hunters during the confrontation, and Majeskie testified the hunters appeared to be upset and scared by his behavior. When confronted by law enforcement, George continued to assert that he was acting pursuant to some sort of governmental authority. He also told dispatch that he intended to make a "citizen's arrest." When interviewed by Andrade seven days later, George continued to display delusional behavior, asserting that he was secretly employed by the president. George also told Andrade that he would be out of the hospital in seventy-two hours and planned to return to duck hunting.

¶28    This evidence was sufficient to establish a pattern of recent acts giving rise to a substantial probability of physical impairment or injury to George or others. Over the course of two days, George was involved in two separate incidents involving firearms that resulted in reports to law enforcement. During the second incident, George confronted a group of hunters while armed, claiming to have some sort of federal law enforcement authority while talking about a "Mexican standoff." Seven days after that confrontation, George continued to exhibit delusional behavior and stated that he planned to return to hunting upon his release. This pattern of behavior created a substantial probability that George would injure someone else while armed and in his delusional state, or that his behavior would provoke someone else to injure him.

¶29    George emphasizes that no harm actually occurred during his confrontation with the hunters. Actual harm, however, is not required in order to support a finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.c. For the

11

reasons explained above, George's pattern of behavior was sufficient to create a substantial probability of harm to either himself or others. That substantial probability of harm was sufficient under § 51.20(1)(a)2.c.

¶30    In his reply brief, George likens this case to *Milwaukee County v. Cheri V.*, No. 2012AP1737, unpublished slip op. (WI App Dec. 18, 2012). In that case, Cheri sought treatment in a mental health facility because she believed she was "being followed by people on Facebook." *Id.*, ¶2. She believed that those people were trying to hurt her and were checking themselves into the same mental health facility. *Id.* A nurse testified that Cheri was "very upset, very angry" and confronted another patient, pointing her finger at him and accusing him of harassing her. *Id.*, ¶3. The nurse became concerned for Cheri's safety and that of the other patients, and she therefore put Cheri in restraints. *Id.*

¶31    The circuit court found Cheri dangerous and ordered her committed. *Id.*, ¶1. On appeal, we reversed the commitment order, concluding there was insufficient evidence to establish that Cheri was dangerous. *Id.* We explained that "yelling at and pointing a finger at another person, irrespective of how dangerous that other person might be, does not" constitute sufficient evidence of dangerousness, "unless there is evidence that the subject of a potential commitment order is trying to goad that other person *in order to* have that other person kill or harm the subject (as in 'suicide by cop')." *Id.*, ¶7.

¶32    George appears to suggest that his conduct in this case was no more indicative of dangerousness than the yelling and finger pointing at issue in *Cheri V.* We disagree. George confronted a group of hunters while armed and repeatedly (and falsely) claimed to have some kind of law enforcement or governmental authority over them. That type of conduct was far more likely to

12

result in harm to George or others than merely yelling and pointing a finger at another individual.

¶33    George also argues the evidence was insufficient for the circuit court to find him dangerous under WIS. STAT. § 51.20(1)(a)2.c. because the probability of physical impairment or injury under that statute is not substantial "if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services."  George reiterates that in order to involuntarily commit him, the County had the "burden of proving all required facts by clear and convincing evidence."  *See* § 51.20(13)(e).  He then asserts that the court improperly shifted the burden to him to prove that it was reasonably probable he would avail himself of services in the community, rather than requiring the County to prove it was not reasonably probable that he would do so.

¶34    The circuit court's oral ruling does suggest that the court may have shifted the burden to George as to the likelihood that he would avail himself of services in the community.  The court referred to the relevant statutory language as "almost" shifting the burden onto George to show that he would avail himself of the relevant services.  The court then observed that although George's attorney had represented that George would voluntarily seek treatment for his mental illness, George did not testify, and the court therefore did not know whether he would actually seek treatment if not committed.  The court later commented that it had no information indicating that George would voluntarily avail himself of services in the community.  These comments suggest that the court faulted George for failing to present evidence showing that he would avail himself of the relevant services.

¶35 Nevertheless, whether the facts satisfy the statutory standard for dangerousness is a question of law that we review independently. *J.W.J.*, 375 Wis. 2d 542, ¶15. Here, upon our independent review, we conclude the County presented sufficient evidence to establish that it was not reasonably probable George would avail himself of services in the community. The evidence at the final hearing showed that George was delusional and believed that he was acting pursuant to authority conferred by the federal government. He reported to Andrade that he had been hospitalized under WIS. STAT. ch. 51 on ten previous occasions. Andrade opined that George does not recognize that he has a mental illness and therefore has a history of noncompliance with treatment, leading to decompensation. Andrade also opined, however, that George is likely savvy enough "to know how to present to hospital staff in order to evade commitment." On this record, the County met its burden to prove that it was not reasonably probable George would avail himself of services in the community because George did not have insight into his own condition, had a history of noncompliance with treatment leading to decompensation, and was capable of presenting in such a way—at least initially—as to suggest to others that treatment was not necessary.

¶36 For all the foregoing reasons, we conclude the evidence was sufficient to establish that George was dangerous under WIS. STAT. § 51.20(1)(a)2.c. We therefore affirm the circuit court's orders for involuntary commitment and involuntary medication and treatment. In closing, however, we pause to address an additional argument raised in the County's appellate brief.

¶37 Specifically, the County argues that given George's "mental status" on the date of the confrontation with the hunters, "even possessing a fire arm [sic] at all created a substantial risk of harm." The County further asserts: "This whole

14

case frankly begs one question; do we believe that individuals who are as delusional and manic as [George] are capable of possessing firearms. The County asserts that the answer to that question is clearly no."

¶38    In his reply brief, George responds that he has a fundamental constitutional right to bear arms.  He further contends that due process and WIS. STAT. ch. 51 "guarantee that [his] fundamental right to bear arms may not be infringed unless the [C]ounty proved by clear and convincing evidence that [he] is mentally ill *and dangerous*."  George argues his mental illness and possession of firearms, without more, are insufficient to establish that he is dangerous.

¶39    We agree with George that his mental illness and possession of firearms, standing alone, are insufficient to support a finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.c.  However, our conclusion that the evidence was sufficient to support a finding of dangerousness under that statute is not premised only on George's mental illness and possession of firearms.  Instead, we conclude the County met its burden to show a pattern of recent acts demonstrating a substantial probability of physical impairment or injury to George or others based on:  George's shooting a firearm into the air in such a way that ammunition fell among houses, vehicles, and officers arriving on the scene; his subsequent confrontational and erratic behavior toward the hunters, while armed with a weapon that was not appropriate for duck hunting and that he admitted was for his own protection; his repeated delusional assertions of law enforcement or governmental authority; and his stated intention to return to hunting after he was released from custody.  Taken together, these circumstances—which include but are not limited to George's mental illness and possession of firearms—created a substantial probability of physical injury or impairment to George or others.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.