## COURT OF APPEALS
## DECISION
## DATED AND FILED

## April 7, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1954-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2014ME267

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF J. E. B.

ROCK COUNTY DEPARTMENT OF HUMAN SERVICES,

    PETITIONER-RESPONDENT,

  V.

J. E. B.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Rock County: DANIEL T. DILLON, Judge. *Reversed and cause remanded with directions*.

¶1 NASHOLD, J.[1] J.E.B. appeals an involuntary recommitment order entered pursuant to WIS. STAT. § 51.20 and an involuntary medication order entered pursuant to WIS. STAT. § 51.61(1)(g)3. She argues that the circuit court failed to identify which statutory standard of dangerousness it relied upon under § 51.20(1)(a)2., as required by *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277, and that the evidence was insufficient to show that she was currently dangerous to herself or others. Because I conclude that the circuit court failed to comply with the requirement set forth in *D.J.W.*, I reverse both orders and remand with directions as set forth below.[2]

## BACKGROUND

¶2 The following facts are undisputed for purposes of this appeal. At the time of the May 2020 hearing in this matter, J.E.B. was a 61-year-old woman who had been receiving mental health care in Wisconsin since 2003. She has had prior commitments during that time but has not continuously been on commitment. For example, J.E.B. was off commitment for four years, from 2010 to 2014, prior to the current commitment and recommitments that began in November of 2014.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). In a January 5, 2021 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memo briefs. *See* WIS. STAT. RULE 809.17. Briefing was complete on February 24, 2021, and the case was not submitted to the court until March 25, 2021. All references to the Wisconsin Statutes are to the 2019-20 version.

[2] Because I reverse and remand on grounds that the circuit court failed to comply with *Langlade County. v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, I do not consider J.E.B.'s alternative argument that the County failed to prove current dangerousness. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶3      The November 2014 commitment appears to have stemmed from a report that in June 2014, J.E.B. was outside of her house, not fully clothed.  Police had received numerous reports about J.E.B. being outside her home unclothed and propositioning men, including an "elderly neighbor."  After failures to appear in court, J.E.B. was ultimately arrested in October 2014.  Police were required to use force to enter her residence, and J.E.B. was charged with disorderly conduct, resisting an officer and lewd and lascivious behavior related to indecent exposure.[3]  When J.E.B. was admitted to jail, she initially refused to wear clothing and refused to eat for 48 hours.

¶4      When J.E.B. was booked into jail, she denied any suicidal ideation or attempts.  However, a few days later, while being evaluated by a nurse for what was later diagnosed as cellulitis in her leg that required hospitalization and intravenous antibiotics, J.E.B. stated, "I'm suicidal now."  J.E.B. was then placed on an emergency detention and taken to the hospital.

¶5      While at the hospital, J.E.B. made inappropriate sexual comments to staff about having multiple orgasms, impulsively entered other patients' rooms, and threatened to spank another patient.  After being transferred to the psychiatric unit, she was uncooperative and paranoid, refused medications, and was guarded with medical personnel.  J.E.B. was involuntarily committed and medicated.

¶6      Following the November 2014 commitment order, J.E.B. received outpatient treatment, including monthly injections of psychotropic medication.

---

[3] The case was ultimately resolved in 2018 with fines for ordinance violations.  J.E.B. has repeatedly told mental health evaluators that she was placed in jail in 2014 because she was walking around her house topless due to hot weather.

J.E.B. was unhappy about taking psychotropic medication and repeatedly complained of troubling side effects. However, during the time period between the 2014 commitment and the 2020 recommitment hearing in this case, J.E.B. generally did not refuse her monthly injections. J.E.B. also voluntarily attended counseling from mid-2017 onward.

¶7 On April 14, 2020, Rock County petitioned the circuit court for a 12-month extension of J.E.B.'s involuntary commitment and for an order authorizing involuntary medication. The circuit court held an extension hearing on May 27, 2020, at which the County's sole witness was psychiatrist Dr. Robert Rawski. The court also accepted Dr. Rawski's written report as an exhibit. Dr. Rawski's report was based on his telephone interview of J.E.B. conducted on May 20, 2020, as well as collateral records, including evaluations conducted by other providers and prior court reports related to the initial 2014 commitment.

¶8 During Dr. Rawski's interview with J.E.B., J.E.B. provided a lengthy personal history, including recounting her hospitalizations and treatment. Her speech was "coherent" and "organized." Her tone of voice reflected no agitation, irritability or hostility. There was no evidence of paranoia and she denied any suicidal or homicidal ideation.

¶9 Dr. Rawski diagnosed J.E.B. with schizoaffective disorder, a treatable mental illness. He testified that when J.E.B. was not sufficiently medicated or treated, her illness impaired her judgment, understanding of reality, and ability to handle daily affairs. He testified that J.E.B. was not competent to refuse medication and that he did not believe that she would continue with medication if not subject to a court order requiring it. He reached these conclusions because of J.E.B.'s statements that she did not have a mental illness

4

and the medications had not benefitted her. Dr. Rawski further testified that J.E.B. had discontinued medication when past commitments had expired. Dr. Rawski opined that J.E.B. would become a proper subject for commitment if treatment were withdrawn.

¶10    J.E.B. testified on her own behalf. She testified that her primary care doctor had recommended a psychiatrist and that she was trying to set up an appointment with him. She testified that she may have "some mental issues" and wanted to speak with someone who would "actually help [her] and not just force medications" on her that might not be the right medications for her. J.E.B. also testified that she would see the new psychiatrist regardless of what happened with the commitment proceeding and that she would probably also continue to see her counselor.

¶11    The circuit court found that J.E.B. had a mental illness and was a proper subject for treatment. As to dangerousness, the court credited Dr. Rawski's opinion that J.E.B. was unlikely to continue medication if not on a commitment and that J.E.B. "will decompensate if left untreated." The court found that, prior to her 2014 commitment, J.E.B. engaged in "behavior which has her dress inappropriately for the weather or the situation, and wandering into dangerous neighborhoods late at night, and kicked out of business because of inappropriate behaviors such as climbing on shelves or becoming confrontational. And with … an unwillingness to seek support." The court stated: "I find that this inappropriate hypersexual behavior did exist. And I find that when it happens, it does increase vulnerability and impaired judgment, and it does result in reckless behavior." The court acknowledged that there had been no dangerous conduct for over five years, observing:

[The conduct] stopped in 2015. Now, the question is, did it stop in 2015 because she's been satisfactorily medicated since then or did it stop because she got better? Nobody asked the question, and seldom is it asked of the examining physicians at what point is there an expectation that this patient is going to begin to recover? And I think there's a chicken and egg and two levels there kind of problem. People don't ask that question because there is no answer. And, also, people don't ask that question because it's impossible to tell to what extent the behavior would come back and how serious it would be until you withdraw medication, and at that point, a person can decompensate to the point where they are dangerous to the point where it's too great a risk to run.

¶12    Although the circuit court mentioned **D.J.W.**, the court did not refer to the subdivision paragraphs in WIS. STAT. § 51.20(1)(a)2. upon which it relied for its recommitment order.[4]  *See D.J.W.*, 391 Wis. 2d 231, ¶3 ("[G]oing forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based.").  And although the County argued that the evidence supported a finding of dangerousness under either subdivision paragraphs c. or d. of § 51.20(1)(a)2., the County did not request that the circuit court make specific findings on, or refer to, either standard.

¶13    The circuit court ordered that J.E.B. be recommitted for 12 months and ordered that she be administered involuntary medication.

## DISCUSSION

¶14    J.E.B. challenges the circuit court's recommitment order on two grounds.  First, she argues that the court did not comply with the requirement in

---

[4] The circuit court's recommitment order likewise does not specify which subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. the court's recommitment relied on.

***D.J.W.*** that the court "make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." *See **D.J.W.***, 391 Wis. 2d 231, ¶3. And second, J.E.B. contends that the evidence was insufficient to show that she was currently dangerous. *See **Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509 ("Each extension hearing requires proof of *current* dangerousness. It is not enough that the individual was at one point a proper subject for commitment. The County must prove the individual '*is* dangerous.'"). With regard to the involuntary medication order, J.E.B. argues, and the County does not dispute, that if the recommitment order is reversed, the medication order must be reversed as well because it is tied to the recommitment order. *See* WIS. STAT. § 51.61(1)(g)3. For the reasons set forth below, I agree with J.E.B. that the circuit court's recommitment order did not comply with the requirement set forth in ***D.J.W.*** Accordingly, I reverse both the recommitment and involuntary medication orders, and remand with directions as set forth below.

I. Standard of Review and Legal Principles
Governing Recommitment Proceedings

¶15    Review of a circuit court's recommitment order under WIS. STAT. § 51.20 presents "a mixed question of law and fact." ***Waukesha Cnty. v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. Appellate courts uphold the circuit court's findings of fact unless clearly erroneous, but whether the facts satisfy the statutory stand is a question of law that is reviewed de novo. ***Id.***

¶16    In order to commit an individual under WIS. STAT. ch. 51, the County has the burden to show by clear and convincing evidence that the individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous

under one of the five alternative dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)1.-2. *See D.J.W.*, 391 Wis. 2d 231, ¶¶23, 29.

¶17    In an initial commitment proceeding, each of the five dangerousness standards articulated in WIS. STAT. § 51.20(1)(a)2. require the County to identify "recent" acts or omissions showing dangerousness. Sec. 51.20(1)(a)2.; *J.W.K.*, 386 Wis. 2d 672, ¶17. However, in a recommitment proceeding, the County is not required to identify acts or omissions that were "recent." Instead, the dangerousness requirement "may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am). The standard in § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *J.W.K.*, 386 Wis. 2d 672, ¶19.

¶18    Although WIS. STAT. § 51.20(1)(am) allows the court to view dangerousness through a different "lens" in a recommitment hearing, that paragraph nevertheless "mandates that circuit courts ground their conclusions" in one of the five dangerousness standards provided in § 51.20(1)(a)2.a.-e. *D.J.W.*, 391 Wis. 2d 231, ¶¶41, 50. In other words, the County must still prove dangerousness under one of those five standards, even though it need not identify recent acts or omissions showing dangerousness and may instead make a showing that there is a "substantial likelihood ... that the individual would be a proper subject for commitment if treatment were withdrawn." *Id.*

8

¶19    To ensure that circuit courts ground their recommitment orders in one of the five standards of dangerousness delineated in § 51.20(1)(a)2.a.-e., in *D.J.W.*, our supreme court mandated the following requirement: "[G]oing forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based."[5]  *D.J.W.*, 391 Wis. 2d 231, ¶3.  The court articulated two significant purposes in imposing such a requirement:

> [T]he purpose of making specific factual findings with reference to a subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. is twofold.  First, it provides clarity and extra protection to patients regarding the underlying basis for a recommitment.  The United States Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." … "Freedom from physical restraint is a fundamental right that 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'"
>
> With such an important liberty interest at stake, the accompanying protections should mirror the serious nature of the proceeding. Requiring circuit courts to provide specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based provides increased protection to patients to ensure that recommitments are based on sufficient evidence.
>
> Second, a requirement of specific factual findings with reference to a subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence.

---

[5] The supreme court also recognized that "there may be cases where a person satisfies the criteria contained in several statutory subdivision paragraphs," and stated that "[i]n such a case, we encourage circuit courts to state each subdivision paragraph that is fulfilled."  *D.J.W.*, 391 Wis. 2d 231, ¶45 n.9.

9

*Id*., ¶¶42-44 (footnote omitted) (citations omitted). Related to this second purpose, the court noted that the court's "newly instituted requirement" would help avoid the "guesswork" that is often involved "in the absence of explicit factual findings with reference to any subdivision paragraph." *Id.*, ¶45.

## II. The Circuit Court Did Not Comply with *D.J.W.*

¶20    J.E.B. argues that the circuit court's recommitment order should be reversed because the court did not make the required findings under *D.J.W.* discussed above. I agree, and, as explained below, reject the County's arguments to the contrary.

¶21    The requirement in *D.J.W.* is straightforward and specific. The circuit court must "make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." *Id.*, ¶¶3, 43. These subdivision paragraphs are the five standards of dangerousness set forth in subdivision paragraphs a.-e. It is undisputed that the circuit court did not cite any of these subdivision paragraphs, nor is it self-evident which standard or standards of dangerousness the court relied on in recommitting J.E.B.

¶22    The County argues that the requirements of *D.J.W.* were nevertheless met because the court adopted Dr. Rawski's testimony and report, and some of the language used by Dr. Rawski and relied on by the court included language that appears in subdivision paragraphs c. and d. of WIS. STAT. § 51.20(1)(a)2. To be sure, the circuit court stated that it was "siding with the medical testimony" provided by Dr. Rawski. However, "a determination of dangerousness is not a factual determination, but a legal one based on underlying facts." *D.J.W.*, 391 Wis. 2d 231, ¶47. Thus, the legal determination of

dangerousness must ultimately be made by the circuit court, not by the examining physician.[6]

¶23    Moreover, I am unpersuaded by the County's argument that the court complied with ***D.J.W.*** by making "specific factual findings" that "reference[d]" subdivision paragraphs c. or d. of WIS. STAT. § 51.20(1)(a)2. *See id.*, ¶¶3, 43-44. Subdivision paragraph c. provides that dangerousness may be shown when an individual "[e]vidences such impaired judgment … that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." Sec. 51.20(1)(a)2.c. In support of its contention that the court complied with ***D.J.W.*** with respect to paragraph c., the County relies on various statements from the court, such as the following:

> [Rawski] also finds that there's substantial likelihood that she would become a proper subject for commitment if treatment were withdrawn, and ... draws that conclusion, and he says the primary risks are inappropriate hypersexual behavior, increasing her vulnerability and impaired judgment resulting in reckless behavior.

The court also summarized one of Dr. Rawski's conclusions as follows: "[J.E.B.'s] mental illness will rebound, and she will then become dangerous, because she will act in a way which makes her vulnerable to exploitation, sexually and other ways, and place herself in dangerous social situations. That's the dangerousness issue." The County asserts that "[t]he circuit court's statements and references to 'impaired judgment' and 'increasing vulnerability' leading to 'reckless behavior' are sufficient to tie back to the third statutory subsection," i.e., subdivision paragraph c. However, even if the court's comments can be construed

---

[6] I note that Dr. Rawski did not refer to any subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. in either his report or testimony.

11

to "tie back" to paragraph c., this does not satisfy the **D.J.W.** requirement of "specific factual findings with reference to a subdivision paragraph of Wis. Stat. § 51.20(1)(a)2." **D.J.W.**, 391 Wis. 2d 231, ¶3.

¶24    The same is true regarding subdivision paragraph d., which provides that dangerousness may be shown when an individual

> [e]vidences behavior … that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

WIS. STAT. § 51.20(1)(a)2.d.   In support of its arguments related to paragraph d., the County notes that Dr. Rawski's report discusses J.E.B.'s lack of medical care and insufficient food intake at the time of the 2014 commitment and that she also went outside unclothed, propositioned men, and wandered into a "dangerous" neighborhood.   The County also relies on the following statement by the court: "[Dr. Rawski] finds … risk of harm would spring into effect from impaired judgment and inability to satisfy her basic … needs for safety."

¶25    Based on these statements, the County argues that the circuit court "allude[d] to" the dangerousness requirement in subdivision paragraph d. However, even assuming the court's comments can be construed as alluding to paragraph d., such comments are insufficient to satisfy the requirement that the court "make specific factual findings" regarding the standards in paragraph d., "with reference to" that paragraph. *See* **D.J.W.**, 391 Wis. 2d 231, ¶3.

¶26    The County essentially asks that I engage in the kind of "guesswork" that **D.J.W.** seeks to avoid.   I decline to engage in such guesswork on appeal.   As

*D.J.W.* makes clear, in addition to protecting significant liberty and due process interests, the requirement in *D.J.W.* also serves to "clarify issues raised on appeal" and "ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." *Id.*, ¶44. Therefore, I instead follow the clear mandate of *D.J.W.* and require the circuit court to do what our supreme court said it must: "make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." *Id.*, ¶3. The court failed to do so here.

¶27 Given this conclusion, I must also consider the remedy for the circuit court's noncompliance with *D.J.W.* J.E.B. argues that the recommitment and involuntary medication orders should be reversed. In response, the County only argues that the court complied with *D.J.W.*; it does not contest that reversal is warranted if this court concludes otherwise, nor does it offer any alternatives to reversal. Nevertheless, although I reverse the court's recommitment and involuntary medication orders, I conclude that the more appropriate course of action is to remand this matter to the circuit court with directions to follow the dictates of *D.J.W.* discussed above. If, on remand, and after further review of the evidence, *D.J.W.*, and the five dangerousness standards in WIS. STAT. § 51.20(1)(a)2.a.-e., the circuit court again determines that the County has met its burden of showing current dangerousness under § 51.20(1)(a)2., then the court must "make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based" as required by *D.J.W. See D.J.W.*, 391 Wis. 2d 231, ¶3.

*By the Court.*—Orders reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.