COURT OF APPEALS
DECISION
DATED AND FILED

November 12, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP100**

**STATE OF WISCONSIN**

Cir. Ct. No.  2020ME7

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF T. M. M.:

TREMPEALEAU COUNTY DEPARTMENT OF SOCIAL SERVICES,

    PETITIONER-RESPONDENT,

  V.

T. M. M.,

    RESPONDENT-APPELLANT.

 

APPEAL from orders of the circuit court for Trempealeau County: RIAN RADTKE, Judge. *Reversed.*

¶1    HRUZ, J.[1] Tiffany[2] appeals from an order extending her involuntary commitment and an order for involuntary medication and treatment,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

both entered pursuant to WIS. STAT. ch. 51. Tiffany argues that the Trempealeau County Department of Social Services ("the County") failed to establish that she was dangerous under any of the standards set forth in WIS. STAT. § 51.20(1)(a)2. She also challenges the circuit court's determination that she was not competent to refuse medication or treatment. Finally, Tiffany argues that the court's ruling at her recommitment hearing did not satisfy the requirements set forth in ***Langlade County v. D.J.W.***, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, because the court failed to identify the particular subdivision paragraph under § 51.20(1)(a)2. on which it based its dangerousness determination. We conclude that the County failed to present sufficient evidence to establish that Tiffany was dangerous under any of the legal standards set forth in § 51.20(1)(a)2. Accordingly, we reverse both orders.

## BACKGROUND

¶2 In February 2020, Tiffany stipulated to orders for commitment and for involuntary medication and treatment under WIS. STAT. ch. 51. The circuit court entered those orders, and both remained in effect for six months. This stipulated commitment arose from an incident during which Tiffany became convinced that a child was locked in her neighbor's house.[3] During the ensuing confrontation between Tiffany and her neighbor, both of them called the police, and the responding officers ultimately transported Tiffany to the hospital and

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than her initials.

[3] Although there is some discrepancy in the record as to whether Tiffany believed her own child was trapped in her neighbor's home or whether she believed it was someone else's child, this fact is not material to our overall analysis.

placed her under an emergency detention. After transitioning to outpatient treatment, Tiffany was placed on another emergency detention in June 2020 and was ultimately returned to inpatient care following an incident in which Tiffany left her car running and was found blocks away riding a bicycle and appearing confused. Prior to the expiration of the initial commitment order, the County filed a petition recommending the extension of Tiffany's commitment, and the court ordered a psychiatrist, James Scott Persing, to examine Tiffany and prepare a report.

¶3 The circuit court held a recommitment hearing on July 31, 2020. Doctor Persing testified that he diagnosed Tiffany with schizoaffective disorder based on his evaluation made in anticipation of the hearing on her commitment extension, on his previous experience as Tiffany's doctor, and on his review of collateral information about her history. Persing also testified regarding his understanding of the specific acts leading up to Tiffany's most recent detention, stating "[t]o my understanding, there was a lot of confusion regarding exactly what had been occurring," and that "[l]aw enforcement again had notes summarizing behavior like bizarre and confused, and apparently there was concern that she left her car running and then had it parked somewhere and then was driving off on her bicycle." When asked if he had any information on why those events were concerning to law enforcement, Persing replied, "I don't."

¶4 Doctor Persing further testified that Tiffany was currently taking antipsychotic medication, and he believed if treatment were withdrawn there was a substantial probability that a "return of symptoms and eventually issues would arise similar to what had occurred prior to her previous episodes of commitment before." Persing specified that a return of symptoms would include "delusional thinking, problems with mood swings, unpredictable mood swings, and then the

concern from a standpoint of leading up to some element of potential for self-harm." When asked to elaborate on the self-harm concerns for someone not being treated for their schizoaffective disorder, Persing provided a general description of several possible outcomes:

> Everyone is a little different with regard to how that could occur. Some people can have voices that tell them to harm themselves or other people; some people can have delusional thoughts that their food has been poisoned and therefore not be taking in proper nutrition or hydration. Other people, the insight and judgment is impacted to the point where they're not safe … and able to properly take care of themselves.

¶5 Doctor Persing believed that there was a substantial probability Tiffany would experience "those issues" if treatment were withdrawn. In support of that opinion, he stated, "[t]he best predictor I can have of future symptoms and behaviors is going to be what's occurred in the past, and this has been a recurrent issue for her." Persing confirmed that he had noticed "those types of behaviors" from Tiffany in the past.

¶6 Doctor Persing stated that Tiffany was not competent to understand the medications prescribed to her because, although she understood that she had a mental illness, she did not understand her medication options and was requesting ineffective or harmful medications she had taken in the past.[4] During Tiffany's testimony, she was able to name the medications she was taking and could describe their effects and advantages. Tiffany testified that although she preferred

---

[4] Tiffany declined to talk to Dr. Persing about her medications in his most recent evaluation of her. As a result, on the subject of medication, Persing testified to his most recent discussion with Tiffany on the subject, which took place "within the last month or six weeks" of the recommitment hearing.

other medications to those currently prescribed to her, she would be willing to take whatever medication she was prescribed. Persing confirmed that Tiffany did not have a history of refusing to take her prescribed medications.

¶7     The circuit court concluded that based on Dr. Persing's testimony, it was evident Tiffany was suffering from a treatable mental illness and was a proper subject for treatment. It also found credible and uncontroverted Persing's testimony that Tiffany was dangerous because without treatment, she would "experience the same type of problems or issues related to things evidenced from the past," in addition to "other potential concerns with folks who don't get treatment for schizoaffective disorder." The court specifically referenced the confusion surrounding Tiffany leaving her car running, in addition to her believing that a child was trapped in her neighbor's house. The court also noted that Persing had testified that, in the past, Tiffany had experienced some symptoms that can manifest in people with schizoaffective disorder. The court further concluded that Tiffany was substantially incapable of understanding the advantages, disadvantages and alternatives to medication or treatment in order to make an informed choice about whether to accept medication.

¶8     The circuit court extended Tiffany's commitment for twelve months, and it entered an order for involuntary medication and treatment for the period of that commitment. Tiffany now appeals.

## DISCUSSION

¶9     In a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous. *See* WIS. STAT. § 51.20(1)(a), (13)(e). Whether this burden has been met presents a mixed question of fact and

law. ***Waukesha Cnty. v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's findings of fact unless they are clearly erroneous. ***Id.*** Importantly, whether these findings satisfy the statutory standards is a question of law that we review de novo. ***Id.***

¶10 Of the three elements the County is required to prove, Tiffany challenges only the sufficiency of the County's evidence regarding dangerousness under WIS. STAT. § 51.20(1)(a)2. A petitioner may prove that a person is dangerous and warrants commitment under any of the five standards set forth in § 51.20(1)(a)2.a.-e., or, in the case of a recommitment, under those five standards in combination with § 51.20(1)(am).[5] ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509. Tiffany asserts, and we agree, that none of the events in her past (as detailed by the circuit court in its oral ruling), or any of the facts or opinions presented at the final hearing (including through Dr. Persing's testimony), establish dangerousness under the legal standards stated in § 51.20(1)(a)2.

¶11 Most prominently, Tiffany argues that while the evidence presented at the final hearing described some of her past actions, most of the evidence failed to illustrate any physical or otherwise harmful consequences resulting or likely to

---

[5] WISCONSIN STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness. Under this provision, if the individual who is the subject of extension proceedings is under a commitment "immediately prior" to the extension proceedings, then the petitioner may, as an alternative to the options outlined in § 51.20(1)(a)2.a.-e., prove dangerousness by showing "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am); ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. In essence, § 51.20(1)(am) removes the requirement that the petitioner show recent acts or omissions in order to establish dangerousness in a recommitment proceeding. *See **J.W.K.***, 386 Wis. 2d 672, ¶19. However, the element of dangerousness must be proven to support any extension. ***Id.***, ¶24.

result from her behavior—a key element in each of the dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2. She notes that it is insufficient to present a general discussion of her mental illness without presenting testimony or evidence as to why her particular acts or omissions were dangerous. We agree. The dangerousness determination varies depending on the standard in question, but it invariably involves negative consequences beyond simply the existence of mental illness or "odd" behavior related to such an illness. Those negative consequences would include a substantial probability of physical harm to one's self or to others, or a substantial probability of death or serious physical injury as a result of an inability to satisfy one's basic needs. *See id.*

¶12    Tiffany cites *D.J.W.*, a case in which our supreme court concluded that without establishing a substantial probability of death or physical injury—i.e., a "serious physical consequence," the petitioner has not satisfied the legal standard for dangerousness under WIS. STAT. § 51.20(1)(a)2.d., despite evidence that symptoms or hallucinations would return absent treatment.[6]  *See D.J.W.*, 391 Wis. 2d 231, ¶¶52-53, 58. Tiffany argues that the evidence presented at her hearing similarly left out any indication as to why *her* behavior was dangerous under any of the relevant standards—indeed, as the circuit court specifically noted, "[t]here was no evidence in the past or presented that there is harm to self, threats of suicide or homicidal in nature, harm to others."

---

[6] Similarly, the supreme court concluded that the County's argument regarding WIS. STAT. § 51.20(1)(a)2.c. "fared[d] no better," because no evidence was presented supporting the conclusion that a "substantial probability of physical impairment or injury" would occur if treatment were withdrawn. *See Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶¶56-57, 391 Wis. 2d 231, 942 N.W.2d 277.

¶13    We agree that the evidence presented at the recommitment hearing regarding Tiffany's past behavior was not sufficiently specific to support a finding of dangerousness.  In a recommitment hearing, there is a key distinction between describing behavior that is erratic, odd or even concerning, and evidencing specific behavior that is likely dangerous.  As this court explained in ***Winnebago County v. S.H.***, 2020 WI App 46, ¶17, 393 Wis. 2d 511, 947 N.W.2d 761, "reliance on assumptions concerning a recommitment at some unidentified point in the past, and conclusory opinions parroting the statutory language without actually discussing dangerousness, are insufficient to prove dangerousness in an extension hearing."

¶14    In ***S.H.***, Winnebago County failed to present details about previous incidents of dangerousness in its case in chief before the circuit court or in its appellate briefing—just as the County failed to do in this appeal.  ***Id.***  The distinguishing feature between this case and ***S.H.***—where the recommitment order was upheld—is relatively subtle, but important.

¶15    In ***S.H.***, a doctor ultimately testified on cross-examination to a previous instance of the appellant's dangerous behavior, which involved bringing a baseball bat to the workplace.  ***Id.***, ¶¶5, 15.  The doctor then tied this behavior to a number of postcommitment paranoid ideations that had occurred relating to that same dangerous incident.  ***Id.***  The appellate court thereby concluded that "[t]his provided the necessary link between past dangerousness and the substantial likelihood of reoccurrence of such behavior absent an extension order—particularly in light of [the doctor's] oft-repeated testimony that [the appellant] is highly likely to stop taking her medication without that order."  ***Id.***, ¶17.

¶16 It is not an onerous burden to describe the ways in which past behavior was dangerous, and then explain how that behavior is likely to reoccur absent recommitment. A plain assumption of dangerousness based solely on the existence of previous commitment orders is not sufficient, nor is a recitation of the events leading up to that commitment without facts or medical opinion establishing why those prior events evidenced the requisite level of dangerous behavior. *See* ***id.***, ¶17 n.9; *see also* ***Outagamie Cnty. v. R.W.***, No. 2020AP1171-FT, unpublished slip op. ¶¶25-26 (WI App Dec. 17, 2020) (explaining how witnesses' testimony provided a link between the committed person's past dangerousness and a substantial likelihood of the reoccurrence of such behavior absent an extension order).[7]

¶17 Here, neither the testimony at the final hearing nor the circuit court's factual findings were sufficient to establish Tiffany's dangerousness under WIS. STAT. § 51.20(1)(a)2. Although Tiffany's behavior in leaving her car running was described as "bizarre" and "delusional" (and perhaps justifiably so), neither Dr. Persing nor the court had knowledge as to why this behavior was concerning to law enforcement such that it necessitated civil commitment, or, more importantly, how it was dangerous either to Tiffany or others. Persing's testimony on this incident was based on his review of the records, but his testimony reflected a lack of awareness regarding the specifics of the events that took place. Alone, evidence of mental illness or irregular behavior like the kind Persing described is insufficient to prove dangerousness—there must be evidence that the behavior led to, or is reasonably likely to lead to, dangerous consequences, so as to fulfill the

---

[7] *See* WIS. STAT. RULE 809.23(3)(b) (permitting the citation of authored, unpublished opinions issued after July 1, 2009, for their persuasive value).

statutory requirements under at least one of the legal standards in § 51.20(1)(a)2. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶57.

¶18    Furthermore, Dr. Persing testified that he had been informed by a case worker in January that Tiffany had been convinced a child was locked in her neighbor's closet, and that Tiffany "confronted [her] neighbor on occasion [and] the neighbor was fearful and contacted law enforcement."  Persing, however, presented no details that anyone was at risk of harm—much less at risk *due to* Tiffany's mental illness (versus, say, boorish behavior)—or any testimony as to the specifics of Tiffany's behavior or her neighbor's reaction during that incident. Without more specific facts or an explanation of the ways in which Tiffany's behavior was concerning or dangerous to either her neighbor or law enforcement, there is insufficient evidence as to what specific acts or omissions occurred that support a finding of dangerousness due to Tiffany's mental illness under the applicable legal standards.

¶19    Stated another way, Tiffany's recommitment cannot be properly based on the possibility of her return to behaviors that themselves are not described by anything other than general or conclusory statements, and behaviors that, as detailed above, evidence no "substantial probability" of harm or physical impairment to anyone.  We decline to make assumptions unsupported by the record regarding Tiffany's behavior, when more specific testimony could have been presented by Dr. Persing or others who had contact with Tiffany over the preceding years so as to explain why Tiffany's behavior was dangerous, such that it met any of the standards under WIS. STAT. § 51.20(1)(a)2.

¶20    Similar to the foregoing deficiencies in the County's case, Tiffany also argues that Dr. Persing's testimony on her schizoaffective disorder was too

vague and general to establish her as dangerous under WIS. STAT. § 51.20(1)(a)2. We agree. When asked what symptoms might return if Tiffany were taken off of her medication, Persing testified: "we would have a return of symptoms and eventually issues would arise similar to what had occurred prior to her previous episodes of commitment before." When asked to clarify what a "return of symptoms" meant, Persing stated that he was referring to delusional thinking, unpredictable mood swings, and then "the concern from a standpoint of leading up to some element of potential for self-harm." Persing testified that Tiffany would experience "those issues" if treatment were withdrawn, and that he had noticed "those types of behaviors from her in the past, the ones that are related to schizoaffective disorder." Persing did not elaborate on the symptoms or issues that occurred prior to Tiffany's commitment, or explain how Tiffany's behavior manifested itself in a dangerous manner on those occasions.

¶21 Doctor Persing's statements are too vague to serve as a basis for Tiffany's recommitment. They fail to sufficiently identify symptoms Tiffany had exhibited in the past or to make particularized conclusions related to Tiffany's schizoaffective disorder. Persing further failed to describe any past actions or behaviors related to Tiffany's mental illness that might be likely to reoccur without treatment, or to distinguish symptoms that occur in schizophrenic patients generally from those that Tiffany actually exhibited. Our supreme court has made it clear that such generalized propositions about persons with schizophrenia are insufficient to establish dangerousness. *See **D.J.W.***, 391 Wis. 2d 231, ¶57. The circuit court's findings at the final hearing were no more specific but, rather, primarily relied upon Persing's testimony regarding generalized concerns. Because Persing's testimony at the hearing failed to be specific as to Tiffany's symptoms, past behavior, or dangerous consequences stemming from that

11

behavior, the evidence was insufficient to prove Tiffany dangerous under any of the standards in WIS. STAT. § 51.20(1)(a)2. despite her schizoaffective disorder.

¶22 The County's rebuttals to Tiffany's arguments are perfunctory. The County reiterates many of the facts from the hearing, but it fails to engage any of Tiffany's substantive arguments regarding the sufficiency of the evidence regarding dangerousness. In particular, the County does not explain how Tiffany's actions met the standards under WIS. STAT. § 51.20(1)(a)2., or address the case law cited—and legal distinctions carefully drawn—by Tiffany in her brief.

¶23 Tiffany next argues that there was insufficient evidence presented at the recommitment hearing to conclude that she was not competent to refuse medication or treatment. As an initial matter, because we conclude the evidence was insufficient to support Tiffany's recommitment order, we could decline to address the remainder of the arguments on this issue. The reversal of the order extending Tiffany's commitment mandates the reversal of the associated order for involuntary medication and treatment because a medication order is tied to the existence of a final commitment order. *See* WIS. STAT. § 51.61(1)(g)3.

¶24 Nevertheless, we note that there are limited facts supporting Tiffany's medication and treatment order. Doctor Persing testified that Tiffany did not have a history of refusing prescribed medications, and Tiffany confirmed at the final hearing that she would be willing to take whatever medicine was prescribed to her, even if she preferred taking a different medication. Additionally, Tiffany was able to list the medications she was currently taking and recite their general purposes, suggesting an understanding of her medications and a willingness to take them.

¶25  Doctor Persing's primary concern was the heightened levels of prolactin caused by an older medicine that Tiffany was requesting, stating "[w]hat she was not aware of in my knowledge was that an elevated prolactin level can cause breast enlargement, lactation, enlargement of the pituitary gland, and trigger a pituitary tumor." Based on Persing's testimony, however, we cannot determine whether this deficiency resulted from Tiffany never having been informed of the potentially dangerous consequences associated with elevated prolactin levels— effects Tiffany never personally experienced—or a lack of understanding despite the drug's potentially dangerous consequences being described to her. There is no evidence in the record that Tiffany was requesting medication that she knew could be or had been harmful to her, or that she was unable to understand the benefits and drawbacks of medications when they were explained to her. Although our reversal of the recommitment order itself necessitates the reversal of the order for involuntary medication and treatment, we are also unconvinced, based on the record, that Tiffany was not competent to refuse medication or treatment such that an order for involuntary medication or treatment would be appropriate.

¶26  Finally, Tiffany argues that the circuit court failed to adhere to the requirement established by our supreme court in *D.J.W.* that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." *See D.J.W.*, 391 Wis. 2d 231, ¶40. She argues the court failed to specify one or more of the subdivision paragraphs of § 51.20(1)(a)2. on which her recommitment was based, instead referencing portions of language from more than one standard.

¶27  We understand Tiffany's contention that the circuit court's ruling at the final hearing may have failed to meet *D.J.W.*'s requirements—by melding

language from several standards and failing to either explicitly name a subdivision paragraph of WIS. STAT. § 51.20(1)(a)2., or to recite any of the applicable standards with enough specificity so as to put Tiffany on notice of the particular basis for her recommitment. However, we do not reach or resolve that issue. Rather, we have already established that Tiffany's recommitment is defective on other grounds, regardless of any potential failure to comply with *D.J.W.* We need not address all issues raised by the parties if one issue is dispositive. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716. Because the record contains insufficient evidence to prove that Tiffany was dangerous under any of the standards in § 51.20(1)(a)2., we reverse Tiffany's recommitment order and the accompanying order for involuntary medication and treatment.

*By the Court.*—Orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14