**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 11, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1563-FT**

Cir. Ct. No. **2008ME87**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF T.M.S.:

CALUMET COUNTY DH&HS,

    PETITIONER-RESPONDENT,

  V.

T.M.S.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Calumet County: JEFFREY S. FROEHLICH, Judge. *Affirmed*.

¶1 GROGAN, J.[1] T.M.S. appeals from WIS. STAT. ch. 51 recommitment orders.[2] He claims Calumet County DH&HS[3] failed to provide sufficient evidence to support the circuit court's finding that if treatment were withdrawn, there is a substantial probability that he would be dangerous to himself or others. This court affirms.

## I. BACKGROUND

¶2 In January 2022, the County filed a petition seeking to recommit T.M.S. Dr. Marshall Bales, whom the circuit court appointed to examine T.M.S., issued a report recommending that T.M.S.'s commitment and medication orders be extended. The court held an evidentiary hearing in February 2022, during which Dr. Bales and Kim Hopp (a County social worker involved in T.M.S.'s case) testified.

¶3 Dr. Bales testified that T.M.S. initially refused to meet with him, but later agreed to talk—allowing a ten-minute conversation. The doctor explained that T.M.S. recognized him from a prior examination. Although the conversation with T.M.S. was "cordial," Dr. Bales testified that T.M.S. "is markedly thought disordered," making his speech "nonsensical [and] incoherent[.]" Dr. Bales questioned how T.M.S. would be able to "function independently in the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] T.M.S. challenges the medication order only as it relates to the involuntary commitment order. Because this court concludes there is a basis for the commitment order, it also affirms the extension of the medication order. Additionally, "recommitment" is synonymous with "extension of a commitment," and the terms will therefore be used interchangeably. *See Sheboygan County v. M.W.*, 2022 WI 40, ¶6 n.3, 402 Wis. 2d 1, 974 N.W.2d 733.

[3] DH&HS is an abbreviation for the Department of Health and Human Services.

community," given his inability to "talk coherently." The doctor referenced "Standard 4[,]" which is found in WIS. STAT. § 51.20(1)(a)2.d, noting that although T.M.S. is not currently suicidal, "[h]e just is not going to be able to function in the community safely in his current mental state."[4] The doctor also "spoke to the nurse that worked with [T.M.S.] this year in detail."

¶4 When the doctor was asked if he had "an opinion as to whether because of [T.M.S.'s] mental illness there's a substantial probability that he might -- he won't be able to take care of himself or he may be a threat to others[,]" Dr. Bales responded:

> Both. He will not be able to properly care for himself. In the past he's become threatening to other people, especially when there's been any kind of alcohol or drug use. He will not take his medicine properly, and he will either become dangerous or endangered. It will be one or the other.

Dr. Bales explained the bases for his opinion:

- T.M.S. is "disorganized in his thinking."

- "His thoughts are very disordered, confused, almost incoherent[.]"

- He will "not be able to take his medications properly [or] manage basic needs[.]"

---

[4] The Record contains some discrepancy as to which of the WIS. STAT. § 51.20(1)(a)2 dangerousness standards provides the link to T.M.S.'s dangerousness under § 51.20(1)(am). Dr. Bales's report links to § 51.20(1)(a)2.b, the second standard, and § 51.20(1)(a)2.d, the fourth standard. At the evidentiary hearing, Dr. Bales's testimony focused primarily on the fourth dangerousness standard. In its closing argument, the County claimed that T.M.S. is dangerous under § 51.20(1)(a)2.c—the third dangerousness standard. This discrepancy is of no import as it was resolved when the circuit court ultimately found T.M.S. dangerous under both the third and fourth dangerousness standards as reflected in its order.

- He would not be able to do his own shopping or cook for himself.

- His history of past drug use would "be imminently dangerous," as "[w]ithin less than a week, there would be police contact, crisis contact, or he'll be arrested for some criminal matter."

¶5    The circuit court also admitted Dr. Bales's report into evidence. The report states that T.M.S. has "no insight into his illness" and that T.M.S.:

> would no doubt stop his medications without a commitment in place and would almost certainly go from his current chronically thought disordered state to also being either suicidal or homicidal or threatening and in the community he would also be vulnerable to a relapse with drug use. He would not be able to take his medication properly.

The report also notes that in the absence of this commitment order, T.M.S. "will almost certainly stop his medications. He will become even more psychotic. He will become a threat to self or others and will not be open to care for his basic needs."

¶5    On cross-examination, T.M.S.'s lawyer asked whether the doctor could "point to any specific information in the records you've reviewed that indicate that he's presently dangerous[,]" and Dr. Bales responded, "No."

¶6    When the circuit court asked Dr. Bales what would happen if T.M.S.'s "treatment was withdrawn entirely," he responded:

> It would be catastrophic, and he would be either dangerous or endangered. He would stop his medicine. He would possibly use drugs again, and he would be homeless. He would not be able to maintain, Your Honor, more than at most a day or two or maybe a week or two at most.

Dr. Bales based this opinion on his "history of working with [T.M.S.]" and his review of T.M.S.'s records.

¶7　Kim Hopp, who is employed by the County "as a social worker human service professional[,]" also testified. She estimated that she has known T.M.S. for four years. Hopp testified that T.M.S. is "unable to take care of himself." She told the circuit court that T.M.S. would not take his medications without the order to do so. When asked if T.M.S.'s "inability to take care of" his basic needs "creates a substantial risk of harm to himself[,]" Hopp agreed that it would. Counsel also asked Hopp whether "the staff inserts themselves into [T.M.S.'s threatening] behavior before it gets any further[,]" and she confirmed that the staff did so.

¶8　The circuit court decided that both T.M.S.'s commitment and medication orders should be extended for twelve months and entered orders doing so. The transcript reflects the basis for the court's decision:

> [T]he Court received testimony from Dr. Bales that [T.M.S.] continues to suffer from a mental illness, that being schizoaffective disorder. It's a substantial disorder of thought, mood, or perception. There doesn't seem to be any real objection to that particular observation by the doctor.
>
> The doctor further testified that there's a substantial probability that [T.M.S.] would not be able to care for himself, and based upon his history, without treatment, in a very short period of time he would decompensate and end up being either a danger to himself or endangered himself.
>
> Specifically when the Court asked the doctor what would happen if [T.M.S.] was no longer subject to the treatment orders … the doctor indicated that he would be homeless, unable to provide shelter for himself, take care of his needs. And given his tendency just to kind of wander around, this would put [T.M.S.] in a substantial probability of death or serious physical injury.
>
> You know, we're going to be in the single digits for low temperatures for the next ten days, and even when things warm up, [T.M.S.] has demonstrated an inability to care for himself.

5

> So the Court is going to find that grounds for extension of the commitment have been established. [T.M.S.] continues to suffer from a mental illness. The doctor has testified that he is a proper subject for treatment. The Court is going to find dangerousness in that there is a substantial probability of physical impairment or injury to himself due to his impaired judgment and, quite frankly, inability to communicate, as shown by the substantial likelihood that based on [T.M.S.'s] individual treatment records that he would be a proper subject for commitment if treatment were withdrawn.

T.M.S. appeals.

## II. DISCUSSION

¶9    This case involves a WIS. STAT. ch. 51 recommitment, which is governed by WIS. STAT. § 51.20. To involuntarily commit an individual, a county must establish by clear and convincing evidence that the person is mentally ill, a proper subject for treatment, and dangerous. Sec. 51.20(1)(a)1-2, (13)(e), (13)(g)3; *Waukesha County v. J.W.J.*, 2017 WI 57, ¶18, 375 Wis. 2d 542, 895 N.W.2d 783.

¶10    "To prevail in a recommitment proceeding, the petitioner must demonstrate the same three elements necessary for the initial commitment[,]" but "'WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of'" commitment immediately before the recommitment petition. *Sheboygan County v. M.W.*, 2022 WI 40, ¶¶18-19, 402 Wis. 2d 1, 974 N.W.2d 733 (quoting *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509). Dangerousness "'may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting WIS. STAT. § 51.20(1)(am)). This method of proving dangerousness is necessary

because "'an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19). If a county relies on § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards from § 51.20(1)(a)2 is required. *Langlade County v. D.J.W.*, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277.

¶11 Here, T.M.S. challenges only the dangerousness element, and therefore, this court need not address the other two elements. The circuit court found the County established dangerousness based on WIS. STAT. § 51.20(1)(am) and linked it to § 51.20(1)(a)2.c and 2.d.

¶12 In this case, the circuit court's recommitment order clearly relied on WIS. STAT. § 51.20(1)(am), which required that T.M.S. "has been the subject of inpatient treatment for mental illness" and "that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *Id.* T.M.S. argues the circuit court's finding is erroneous because there was insufficient evidence to establish a dangerousness link to any of the five statutory standards in § 51.20(1)(a)2. The circuit court's order marked both the third and fourth dangerousness standards in § 51.20(1)(a)2.c and 2.d as links to support its finding that there is a substantial probability that, if treatment were withdrawn, T.M.S. would be a proper subject for commitment. Because this court's review demonstrates there is evidence to support a link to the fourth dangerousness standard, it is not necessary to address the third standard. *See Maryland Arms*

*Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("[A]ppellate court[s] should decide cases on the narrowest possible grounds.").

¶13     WISCONSIN STAT. § 51.20(1)(a)2.d identifies dangerousness as "behavior manifested by recent acts or omissions that, due to mental illness," prevents the individual from being able to "satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness." *Id.* This dangerousness standard cannot be met "if reasonable provision for the individual's treatment and protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services[.]" *Id.*

¶14     This court's review of the Record demonstrates there is sufficient evidence to support a link to the fourth dangerousness standard.  Dr. Bales's testimony and report, together with Hopp's testimony, were sufficient.  The doctor opined that, without the commitment, T.M.S. would go off his medication, be unable to take care of his basic needs, and become dangerous to himself (or others).  His report said T.M.S. would "almost certainly" become "suicidal or homicidal or threatening[.]"  Hopp confirmed that if the commitment was not extended, T.M.S. would not take his medication and also confirmed that T.M.S. is not capable of caring for his own basic needs.  The doctor testified that withdrawing treatment would be "catastrophic" and that within two weeks at most, he would be homeless and unable to find his way to a homeless shelter.  Dr. Bales explained that T.M.S. is unable to communicate effectively and does not understand that he has a mental illness.  Hopp explained that T.M.S.'s aggression

is tempered because the staff of the facility where he is currently committed intervenes to squelch escalation. The Record therefore supports the circuit court's decision.[5]

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[5] T.M.S. emphasizes Dr. Bales's answer to a single question on cross-examination— namely, that the doctor responded "No" when asked if he could "point to any specific information in the records" he reviewed to show that T.M.S. is currently dangerous. This court is not persuaded by the isolated question and answer for several reasons. First, Dr. Bales opined that if T.M.S. was released from commitment, he would be dangerous to himself and others. Second, the Record reflects that when Dr. Bales attempted to explain his "No" answer, T.M.S.'s attorney stopped him. Third, this is a recommitment where T.M.S.'s medication and treatment prevents T.M.S. from engaging in dangerous acts at the current time. Fourth, Hopp explained that even if T.M.S. acts in a threatening manner, the staff intervenes, redirects, and diffuses the situation.